467 P.2d 763

M. Taylor **LAWRENCE**, Jr., and Bettie A. Lawrence, his wife, and Arthur J. Stegall, Jr., and Rosann Stegall, his wife, Appellants,

v.

**VALLEY NATIONAL BANK**, a national banking association, Appellee.

**ARIZONA–COLORADO LAND & CATTLE COMPANY**, a corporation, Cross-Appellant,

v.

M. Taylor **LAWRENCE**, Jr., and Bettie A. Lawrence, his wife, and Arthur L. Stegall, Jr., and Rosann Stegall, his wife, Cross-Appellees.

**Nos. I CA–CIV 1000, I CA–CIV 931.**

Court of Appeals of Arizona, Division 1.

April 8, 1970.

Rehearing Denied May 29, 1970.

Review Denied July 7, 1970.

Review Granted Nov. 10, 1970.

Jennings, Strouss & Salmon, by O. M. Trask, Thomas C. Kleinschmidt, Rex H. Moore and T. J. Trimble, Phoenix, for appellants and cross-appellees.

Rawlins, Ellis, Burrus & Kiewit, by Chester J. Peterson and Dennis M. Balint, Phoenix, for appellee.

Snell & Wilmer by Mark Wilmer, Phoenix, for cross-appellant.

HOWARD, Chief Judge.

A civil action was instituted by plaintiff-appellee, Valley National Bank, hereinafter referred to as the "Bank," to recover the unpaid balance on a promissory note. The defendants-appellants are Lawrence, Stegall, Brown and their wives, individually and as co-partners d/b/a Lawrence, Stegall and Brown. The note was in the sum of $496,834.41 and the unpaid balance was $84,527.04 plus interest and attorneys' fees. Brown and his wife defaulted in the action. The appellants filed a third party complaint against Arizona-Colorado Cattle Co., Inc., hereinafter called the "Cattle Co.," claiming that the "Cattle Co." was either liable directly to the "Bank" on the indebtedness or was liable by way of indemnity to the appellants. The "Cattle Co." filed an answer setting up the execution of certain instruments by way of defense.

Lawrence and Stegall as partners started a ranching and cattle business in 1956. In 1957, Jack Cooke joined them and they operated as Lawrence, Stegall and Cooke to furnish lands and Brown to locate cattle which they were to buy. The written agreement was entitled Joint Venture Agreement and the profits and losses were to be shared on a two-thirds for Lawrence, Stegall and Cooke and one-third for Brown basis.

Later Lawrence, Stegall and Cooke incorporated but continued the joint venture under the same terms. Then the corporation was dissolved and Lawrence and Stegall as partners continued the joint venture with Brown. In 1961, Lawrence, Stegall and Brown and their wives signed a "Certificate of Partnership" for the "Bank." It authorized any partner to bind the partnership and the partners jointly and severally for any amounts, and the partners agreed to remain bound until the "Bank" was given sixty days written notice of the revocation of authority.

On February 1, 1963 the partnership assets of Lawrence and Stegall were transferred to a new corporation, Lawrence & Stegall Ranches, Inc., hereinafter referred to as the "Corp." which was formed by Lawrence, Stegall, Wray and two others. On June 3, 1963 the corporation borrowed approximately five million dollars secured by a mortgage and trust agreement, the trustee of which was the "Bank." The Trust Agreement stated that the "Corp.," Lawrence & Stegall Ranches, Inc., now owned all real and personal properties and assets of the partnership except for certain incidental property not pertinent to our inquiry.

Thereafter, the corporation operated on an enlarged scale. Brown would buy cattle and issue drafts through the "Bank" on the Lawrence, Stegall and Brown account. The "Bank" would honor the drafts and when the draft account, based upon a line of credit, reached a certain size, a promissory note would be signed.

On September 2, 1964 the promissory note sued upon herein, was prepared as a partnership note. At the bottom thereof was typed "ARTHUR J. STEGALL, JR., M. TAYLOR LAWRENCE, JR., AND V. D. BROWN, A PARTNERSHIP DBA STEGALL, LAWRENCE & BROWN BY:" and it was signed by M. T. Lawrence, Jr. It was secured by a chattel mortgage on Lawrence, Stegall and Brown cattle and by cattle owned by the "Corp." Appellants claim that the "Bank" was kept closely advised of the changing membership of the joint venture.

Financial reports prepared by the "Corp.'s" accountants were supplied to the "Bank." One of the reports contained, for example, a note to Financial Statement of December 31, 1963, page 7, stating:

"Included with the accounts of Lawrence & Stegall Ranches, Inc. are the Company's interests in two joint ventures—Stegall, Lawrence & Brown Joint Venture (two-thirds). * * *"

There was testimony that an officer of the "Bank," Mr. Jacobson, was advised by an officer of the "Corp." in September, 1964 that the promissory note recently signed by Lawrence on behalf of the Lawrence, Stegall and Brown partnership,

should have been signed on behalf of the joint venture consisting of the "Corp." and Brown.

Proceeds from the sale of joint venture cattle in the inventory of the "Corp." were deposited in the "Corp.'s" bank account and checks were drawn thereon in payment or reduction of the Lawrence, Stegall and Brown debt to the "Bank." The joint venture did not have a bank account. The "Corp." shared the profits and losses of the joint venture. Lawrence and Stegall did not participate in either the profits or losses of the joint venture after the transfer of the partnership assets to the "Corp." on February 1, 1963.

In 1964 the cattle market became depressed and remained so for a long time. Heavy losses ensued and Lawrence and Stegall entered into an agreement to sell all of their capital stock in the "Corp." to others, among whom was Wray, one of the founders of the "Corp.," who had resigned as an officer and director shortly before the sale.

The sale was evidenced by an agreement dated February 27, 1965 together with subsidiary and supporting documents and mutual releases. The new management took over and changed the name of the corporation to Arizona-Colorado Cattle Co., Inc. The Lawrence, Stegall and Brown cattle in the inventory of the "Corp." were sold by the cattle company and the proceeds were used to reduce the debt of the joint venture to the "Bank." The cattle company thereafter paid to the "Bank" $185,000.00 representing approximately two-thirds of their existing joint venture debt due the "Bank." It did not pay the one-third attributable to Brown. Thereafter, the "Bank" filed this lawsuit.

The complaint alleges that the partnership and the partners individually, are responsible for the balance due on the promissory note signed by Lawrence on behalf of the partnership.

The answer admits Lawrence signed the note sued upon. It is alleged that with the knowledge and approval of the "Bank," Lawrence and Stegall sold their two-thirds interest to the "Corp." That in consideration of the sale, the "Corp." assumed and agreed to pay all of the debts of the partners, including their direct liability and any contingent obligations which might arise from the failure of Brown to pay his one-third share. The answer further asserts that this transaction constituted a dissolution of the original joint venture and created a new joint venture with the "Corp." in the place and stead of Lawrence and Stegall. That the "Bank" engaged in a course of dealings with the new joint venture and, by reason thereof, Lawrence and Stegall as individuals had been discharged of their liabilities and that the "Corp.," having assumed the debt, is the obligor.

The trial court found in favor of the plaintiff-"Bank" against the defendants-partners, making findings of fact and conclusions of law. Judgment was also rendered in favor of the third party plaintiffs-partners and against the third party defendant-"Cattle Co."

Defendants appeal from the judgment and claim first that Findings of Fact numbered 3, 4, 5, 6, 7, 11 and 12 are not supported by the evidence.

The "Bank" contends that the Findings of Fact are not so "clearly erroneous" as to be set aside. The Findings of Fact in dispute are as follows:

"3. None of the individuals signing said Certificate of Partnership ever revoked the authorities granted by said Certificate, as required by the terms set forth therein.

4. The Plaintiff never at any time, after the time of execution of said Certificate of Partnership on June 21, 1961, either orally, in writing or in any other manner, acknowledged or consented to any change in the partnership of STEGALL, LAWRENCE & BROWN, a co-partnership.

5. After the execution of the partnership agreement on June 21, 1961, through September 2, 1964, both of the Defendants, M. TAYLOR LAWR-

ENCE, JR. and ARTHUR J. STEGALL, executed various notes, chattel mortgages and other agreements on behalf of the partnership, STEGALL, LAWRENCE & BROWN, a co-partnership, which were delivered to the Plaintiff, each of which continued to reflect the existence of the partnership, known as STEGALL, LAWRENCE & BROWN, a co-partnership, as evidenced by the Certificate of Partnership of June 21, 1961.

6. On September 2, 1964, the partnership STEGALL, LAWRENCE & BROWN, a co-partnership, being justly indebted to the Plaintiff, executed the promissory note, which is the subject of this litigation, through Defendant, M. TAYLOR LAWRENCE, JR., acting for and on behalf of said partnership, he having been authorized so to do.

7. Plaintiff received and accepted said promissory note pursuant to and in reliance upon the Certificate of Partnership dated June 21, 1961, which had not been revoked and was still in effect.

\*   \*   \*   \*   \*   \*

11. The Plaintiff, THE VALLEY NATIONAL BANK OF ARIZONA, at no time relevant to this litigation, consented or agreed to a dissolution of the partnership reflected in the Certificate of Partnership dated June 21, 1961, or to the formation of any new partnership known as STEGALL, LAWRENCE & BROWN, a co-partnership, either in writing or by its action or inaction, or by any course of dealing with the Defendants herein.

12. The Plaintiff, THE VALLEY NATIONAL BANK OF ARIZONA, never had knowledge of any dissolution of the partnership of STEGALL, LAWRENCE & BROWN, a co-partnership, nor did it ever consent to a material alteration in the nature or time of payment of the obligation, of said partnership, which is the subject matter of this litigation."

All of the Findings of Fact questioned by appellant revolve about one point, namely, did the appellee have actual or constructive knowledge of the metamorphosis of the partnership from the time the certificate of partnership was executed in 1961 to the date of the signing of the promissory note on September 2, 1964. No evidence was presented showing that actual notice of the revocation of the partnership was given to the "Bank"; that the "Bank" actually and clearly, either orally or in writing, consented to a change in the original partnership; or that the "Bank" had written notice of the dissolution of the original partnership. There being no actual notice of the above facts, we must now turn to the consideration of whether or not the "Bank" had constructive notice.

One significant document, with regard thereto, is the Mortgage and Trust Agreement dated June 3, 1963 between Lawrence & Stegall Ranches, Inc. and the "Bank." This agreement was to secure the borrowing by the "Corp." of some four or five million dollars from eastern institutional investors. On page 3 (par. 4.5) of Exhibit 1 to said Mortgage and Trust Agreement is the following statement:

"\* \* \* The Company now owns all real and personal properties and assets held by the Partnership at December 31, 1962 or thereafter acquired by it other than (a) cattle sold in the ordinary course of business by the Partnership subsequent to December 31, 1962 and other assets consumed or disposed of by the Partnership in the ordinary course of business since such date, (b) approximately ten deeded acres in downtown Scottsdale, Arizona, and (c) a residence occupied by one of the Company's officers in Phoenix."

The partnership referred to was Lawrence & Stegall Ranches. What is stated in the Trust Agreement, however, does not set forth in any manner whatsoever that the specific partnership or joint venture of Lawrence, Stegall and Brown was involved

therein. Nowhere has appellant shown that the "Bank" as creditor of the original partnership agreed to relieve the withdrawing partnership from liability. White v. Brown, 110 U.S.App.D.C. 232, 292 F.2d 725 (1961). Appellee contends that it cannot be inferred, from the course of dealings between the "Bank" and the partnership, that the "Bank" knew of the dissolution of the original partnership and consented to it. An examination of the evidence presented at the trial, including the testimony, exhibits and depositions reveals that questions of fact were raised and were properly submitted to the court for its determination.

Let us consider the cross-appeal by the "Cattle Co." from the judgment entered against it and in favor of the individual partners Lawrence and Stegall and their wives.

The "Cattle Co." claims that the trial court erred in admitting parol evidence to vary the terms of the contract of February 27, 1965 and of the Mutual Releases dated March 4, 1965. Said contract for the purchase of the stock of Lawrence & Stegall Ranches, Inc. consists of twenty-four typewritten pages plus seventeen pages of schedules annexed thereto. Nowhere in all of this welter of covenants, restrictions and conditions is there a specific reference to the contingent liability of Lawrence and Stegall for the possible default of Brown resulting from the partnership or joint venture operations of Lawrence and Stegall, or Lawrence and Stegall Ranches, or Lawrence & Stegall Ranches, Inc. with Brown. There is no dispute that the "Cattle Co." was to become liable and had agreed to indemnify Lawrence and Stegall for any losses resulting from the operation of the partnership or join venture with Brown.

The only question that remains is whether they agreed and contracted to be liable for the one-third interest of Brown, in the event that he would be unable to pay his share of any losses sustained by the partnership or the joint venture. The cross-appellant says "no," basing same upon the following statements in its opening brief: that schedule C of the February 27, 1965 agreement was to contain a list of all defaults under any indenture or contract or agreement to which it is a party; that the agreement was signed February 27, 1965 and the closing was to take place originally on March 2nd, but actually did not take place until March 4, 1965; that the note sued upon by the "Bank" and claimed to be the obligation of the "Corp." was dated September 2, 1964 and was due on March 1, 1965.

Thus, since the note was not paid, there was a default on the closing date of March 2, 1965. This obligation is not set forth in schedule C.

Lawrence and Stegall each warranted and represented in paragraphs 4 and 4.1 of the February 27, 1965 contract, that he:

" * * * has not obligated the Company or any subsidiary to any contract not reflected on the Company books or referred to in this Agreement or Exhibits hereto; that he has not obligaged the Company or any subsidiary for any liability which is not reflected or reserved against in the Company's Balance Sheet of December 31, 1964, except (i) obligations incurred in the normal course of the Company's business subsequent to December 31, 1964, and (ii) liabilities not in excess of the aggregate sum of $25,000.00. * * * "

The Balance Sheet of December 31, 1964, Exhibit 35 in evidence, page 1, reflected:

"Cattle inventories—at cost not in excess of market $5,265,636.26."

At the bottom of page 1 appears Note 1 which reads as follows:

"The cattle inventory and liability thereon *includes only ⅔rds of the Stegall, Lawrence & Brown Joint Venture cattle inventory and liability.*" (Emphasis added.)

Paragraph 3.3 of the Purchase Agreement incorporates by reference the state-

ments of income and deficit for the year ending October 31, 1964 certified by an independent accounting firm. An examination of pages 7 and 8 of the accounting firm's statement shows a deficit of $294,-880.00 with regard to the Lawrence, Stegall and Brown joint venture. The footnote on page 12 of the said statement says that the company, Lawrence & Stegall Ranches, Inc., is a party to a joint venture and contingently liable as guarantor on chattel mortgages and unsecured bills of the joint venture aggregating approximately $250,000.00.

It is the cross-appellees-partners' contention that the above two footnotes are contradictory and create an ambiguity. They say the note on page 12 of the accountant's statement states that there is a contingent liability on the part of the "Corp." as guarantor of the obligations of the joint venture including the liability of Brown. The note at the bottom of the unaudited statement refers to two-thirds of the Lawrence, Stegall and Brown cattle and to only a two-third liability. Nothing is said about the contingent liability of Brown or that it is or is not excluded from the terms of the agreement or whether or not Lawrence and Stegall assume and agree to pay Brown's contingent liability if he does not pay same.

Cross-appellees further claim that the extrinsic evidence was to the effect that the contingent liability of the "Corp." for Brown's one-third was discussed; that it was not spelled out more particularly at the request of the "Cattle Co.," the latter hoping to prevail upon the "Bank" to look solely to Brown for that debt and not to the "Corp."; that if this was not successful, the one-third would be paid by the "Corp." They also allege that this evidence is consistent with the terms of the agreement as written and is consistent with the indemnification clause therein protecting Lawrence and Stegall from all company obligations. The indemnification clause of the agreement states:

"11. Purchaser agrees to cause the Company to enter into an agreement to indemnify and hold Lawrence and Stegall and each of them harmless against any liability arising by virtue of their execution of personal guaranties with respect to bank loans of the Company, and any and all other personal guaranties of Company obligations."

The Mutual Release, Item 28, Exhibit 30 in Evidence states: (Second Party refers to Lawrence and Stegall and their respective wives, Harry Cavanagh and Sherwood Johnson. First Party refers to Lufkin and Wray and Company refers to Cattle Company.)

"2. Second Party *hereby releases First Party and Company* and each of them of and from any and all claims, demands, actions or causes of actions of any sort or type which they or any of them may *have against First Party or Company or either of them on account of any matter or thing arising out of any act, transaction, condition, occurrence, contract or agreement prior to the date of this agreement,* provided, however, that this release is not intended to and it shall not release First Party or Company or either of them of and from any and all covenants, obligations or liabilities *arising out of the Agreement,* nor is this release intended to and it shall not discharge First Party or Company or either of them of and from any and all obligations, covenants or liabilities *arising out of any document executed pursuant to the terms of the Agreement."* (Emphasis added.)

The mutual release is one of many supporting documents called for by the terms of the agreement and signed by the parties. It was intended to operate as a general release of any unknown or extraneous claims of either party against the other. It states that it does not release the company from any obligations or liabilities arising out of the agreement. The cross-appellees argue that if a purchaser acquires the stock of a

corporation, it acquires the corporation with all of its debts. They further contend that if the corporation is a party to a joint venture, the joint and several liability of the corporation to pay the obligations of the other venturer is a part of its obligation and that this is an obligation arising out of the agreement.

■ The trial court held that the aforesaid documents were ambiguous in that there is no clear indication of the intent of the parties as to whom would be responsible for Brown's one-third contingent liability in the event that Brown was unable to pay his share of any losses incurred by the partnership or joint venture. Parol evidence was not admitted to contradict or change the terms of the agreement. Our holding in Aztec Film Productions v. Tucson Gas & Electric Co., 11 Ariz.App. 241, 463 P.2d 547 (1969) is in point, namely:

"Our decision is further buttressed by the well-recognized exception to the parol evidence rule that if the terms and provisions of a contract are ambiguous, or if the writing is capable of more than one construction, parol evidence is admissible to explain and ascertain what the parties intended."

■ Even if the trial court erred in allowing the introduction of parol evidence, we believe that the documents hereinabove referred to are sufficient, in and of themselves, for the trial court to have come to the same conclusions without the parol evidence. The proceedings in the trial court involved a complex trial with voluminous exhibits and numerous depositions of witnesses with regard to the principal and the third party action. The trial court saw and heard the witnesses whereas we only have before us a cold transcript.

In matters of factual dispute, we defer to the trial court. All inferences supported by the evidence will be taken in favor of appellee. Contractor & Mining Service & Supply, Inc. v. H & M Tractor & Bearing Corp., 4 Ariz.App. 29, 417 P.2d 542 (1966).

■ The judgment of the superior court is presumed correct if there is reasonable evidence in the record to sustain it and the reviewing court will not substitute its own discretion for that exercised by the court below. Tucson Warehouse and Transfer Company v. Arizona Corporation Commission, 2 Ariz.App. 565, 410 P.2d 683 (1966).

■ The reviewing court must affirm the judgment if possible on any theory framed by the pleadings and supported by the evidence. Minderman v. Perry, 103 Ariz. 91, 437 P.2d 407 (1968); Nicholas v. Giles, 102 Ariz. 130, 426 P.2d 398 (1967); Oney v. Barnes, 5 Ariz.App. 460, 428 P.2d 124 (1967); Moeur v. City of Tempe, 3 Ariz.App. 196, 412 P.2d 878 (1966); Ensign v. Bohn, 1 Ariz.App. 386, 403 P.2d 321 (1965).

■ On appeal, appellant has the burden of demonstrating that error was committed below, and upon failure to do so, the Court of Appeals has no alternative but to affirm. Zuniga v. City of Tucson, 5 Ariz. App. 220, 425 P.2d 122 (1967). Neither the appellant nor the cross-appellant has sustained this burden.

Judgments affirmed.

KRUCKER and HATHAWAY, JJ., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.