501 P.2d 432

**WESTERN SAVINGS & LOAN ASSO-
CIATION, Appellant,**

v.

**DIAMOND LAZY K GUEST RANCH, INC.,**
and Karl Bailey Johnstone, a single
man, Appellees.

No. 1 CA–CIV 1737.

Court of Appeals of Arizona,
Division 1,

Department A.

Sept. 26, 1972.

Rehearing Denied Oct. 26, 1972.

Review Denied Nov. 21, 1972.

Streich, Lang, Weeks, Cardon & French by B. Michael Dann, Phoenix, for appellant.

Allen L. Feinstein, Phoenix, for appellees.

STEVENS, Presiding Judge.

Briefly, a $50,000 note and a mortgage were executed and promptly assigned by the mortgagee. On default the assignee filed a mortgage foreclosure action and recorded a notice of *lis pendens*. The makers of the note, being the mortgagors, urged a number of defenses. The assignee-plaintiff then attached the real property described in the mortgage together with certain personal property and caused a series of writs of garnishment to issue. The maker-mortgagor did not resist a motion for summary judgment by which assignee secured a partial summary judgment in a principal sum less than the face amount of the note, foreclosed its attachments and secured a recovery on one of the writs of garnishment. Before the sheriff's sale the partial summary judgment, together with the note and mortgage were assigned to the present plaintiff-appellant which bid in the attached real and personal property at the sheriff's sales.

Thereafter the present plaintiff-appellant sought judgment for that portion of the face amount of the note in excess of the principal sum of the partial summary judgment and sought to foreclose the real estate mortgage. This request for relief was denied and the present appeal followed.

The attorneys who represented the original plaintiff in the mortgage foreclosure and in the attachment carried the action through the partial summary judgment and after the assignment to the present plaintiff-appellant the present attorneys for the appellant entered into the picture. The attorney who represented the defendant corporation and the defendant individual through the partial summary judgment thereafter withdrew and the present attorney for the appellees was substituted. Present counsel represented the parties at the trial which led to the appeal which is now before this Court.

The basic questions presented on this appeal are:

1. The effect of the failure of the trial judge to rule within 60 days after submission;

2. Was the transaction usurious;

3. Was the first assignee of the note and realty mortgage, being the original plaintiff in the mortgage foreclosure action, a holder in due course; and

4. Was there an accord and satisfaction in relation to the entry of the partial summary judgment.

We first list numerous persons and organizations involved one way or the other in this transaction.

The makers of the promissory note and the parties executing the real estate mortgage were the Diamond Lazy K Guest Ranch, Inc. and Karl Bailey Johnstone. Johnstone was the president of the Lazy K Guest Ranch Inc. These parties will be collectively referred to as the defendants and separately referred to as the defendant corporation or as the defendant Johnstone.

Guardian Services, Inc. and David S. Smith. Smith was the manager of Guardian Services which was an escrow company.

Surety Mortgage, Inc. and Walter Johnson. Johnson was the president of Surety Mortgage, the business of the company being that of a mortgage broker.

Inland Western Mortgage Company and Jack L. Daughtry. At the times in question Daughtry was the vice-president of

Inland Western, a company dealing in real estate mortgages and land contracts.

Union Title Company is the company with which the instruments of title were deposited, which recorded these instruments, and through which certain funds were disbursed. Union Title issued a title policy.

Western Savings & Loan Association, which will hereinafter be referred to as Western Savings, came into the picture after the granting of a motion for summary judgment and was the plaintiff at the time of the trial of the issues now before this Court.

There are two parcels of real property which will be designated as Parcel 1 and Parcel 2. Parcel 1 was improved with a guest ranch or a motel operated by the defendant corporation. Parcel 2 is approximately 2½ acres lying adjacent to Parcel 1.

■ The trial court did not enter findings of fact or conclusions of law and we review this record in the light favorable to sustaining the judgment. Jerger v. Rubin, 106 Ariz. 114, 471 P.2d 726 (1970), and Fleming v. Becker, 14 Ariz.App. 347, 483 P.2d 579 (1971). If there is any theory which would sustain the judgment, based upon the evidence which was presented, the judgment will be sustained on appeal. Haenichen v. Worthington, 9 Ariz.App. 83, 449 P.2d 319 (1969).

Sometime prior to the transactions here in question the defendant Johnstone, as an individual, contracted to purchase Parcels 1 and 2 under a single contract of sale with the collection escrow being held by the Phoenix Title & Trust Company. The release of Parcel 1 from the contract was secured and the title was ultimately conveyed to the defendant corporation. Parcel 1 was mortgaged to Western Savings and this mortgage is recognized by all parties as being a valid and subsisting first mortgage. The defendant corporation operated a guest ranch or lodge on Parcel 1 which was adjacent to the vacant 2½ acre Parcel 2.

Sometime in 1964 the defendant Johnstone desired additional cash. Smith was employed as a finder. Apparently Smith undertook this responsibility as an individual and not in his capacity as manager of Guardian Services. At the time there was due and unpaid on the purchase price of Parcel 2 a sum of money slightly less than $4,000.00. Smith advised the defendant Johnstone that he could not place a loan with Parcel 1 as security, this parcel already being subject to a valid mortgage in favor of Western Savings, unless Parcel 2 was also mortgaged as additional security. The defendant Johnstone was most reluctant to mortgage Parcel 2.

Smith and the defendant Johnstone met on Monday, 1 June 1964 at which time the defendant Johnstone executed a 1-year $50,000 promissory note bearing interest at the then maximum legal rate of 8% per annum, a real estate mortgage to secure the note, and escrow instructions directed to Guardian Services. Johnstone signed as an individual and for the defendant corporation as its president. The escrow instructions bear the date of 29 May. The note bears the date of 31 May. The mortgage as recorded bears a notarial acknowledgment of the signature of the defendant Johnstone in his capacity as president of the defendant corporation and in his individual capacity, these acknowledgments bearing the date of 31 May, yet it is clear from the evidence that the notary was not present when Johnstone signed and that Johnstone did not acknowledge his signature in the presence of a notary. The defendant Johnstone urges that it was not until after the mortgage was executed that it was modified by adding Parcel 2. The note and mortgage are in favor of Surety Mortgage.

Smith and his secretary prepared a close-out sheet to be given to Union Title in connection with the escrow. This sheet bears the entry "paid direct to seller $10,000.00." Under the subheading "Funds Deposited Into Escrow Account" the only item appearing is the sum of $40,000.

Johnson on behalf of Surety Mortgage and Daughtry on behalf of Inland Western had conferred about the loan before the papers were signed. Daughtry had seen the appraisal which was used in connection with the already existing mortgage to Western Savings covering Parcel 1 and he had inspected Parcel 1 together with its improvements as well as Parcel 2. During the trial after some equivocation he acknowledged that he had received a copy of the proposed close-out sheet before he expended any money from the Inland Western account.

On 1 June the note was endorsed by Johnson for Surety Mortgage and on behalf of Surety Mortgage Johnson executed a formal assignment of the mortgage to Inland Western. On the same date Inland Western over the signature of Daughtry sent $45,000 to Union Title with instructions to issue its insurance policy in favor of Inland Western. The mortgage and the assignment were recorded on 2 June disclosing consecutive recording fee numbers.

Union Title paid off Parcel 2 and after some deductions for conventional escrow charges against the defendants a check was issued to the defendant Johnstone for slightly over $35,000. Though not reflected in the close-out statement, $5,000 of the $45,000 was paid to Surety Mortgage which in turn paid therefrom a $1250 finder's fee to Smith. Surety Mortgage also paid John Sanderson two checks, one for $1,660.40 and one for $216.10, the only explanation being:

"A. Oh, he worked on the deal. It's a real estate broker's fee."

The record is silent as to any such services having been rendered.

The close-out statement, a copy of which Daughtry acknowledged he had received, given to Union Title by Surety Mortgage, discloses that the $10,000 figure purportedly "paid direct to seller" is circled in red and marked "omit." Daughtry recognized that such a direct payment on a mortgage transaction was unusual and made no inquiry about it. He expressed the opinion

that Surety Mortgage had paid Johnstone less than the face amount of the note stating:

"And my question to you now is, what gave you that idea?

*    *    *    *    *    *

"Q. So then it was really a logical deduction based upon your experience in mortgage transactions that led you to conclude that really logically Johnson and Surety Mortgage paid less than $50,-000 to Johnstone and Diamond Lazy K?

"Yes.

"Q. So you were as certain of that as being certain of anything that would be reasonable?

"A. That's true."

The promissory note was due one year after its execution and provided for quarterly payment of interest. Only the first quarterly interest payment was made and thus the note came in default. Inland Western, as plaintiff, sued on the note for the full $50,000 and sought a foreclosure of the mortgage. A notice of *lis pendens* was recorded at the time of the filing of the foreclosure action. The defendants answered, urging among other matters, that the mortgage was not intended to cover Parcel 2; that there was no corporate resolution authorizing the execution of the note or the mortgage; that the defendant Johnstone had no authority to bind the defendant corporation; that the mortgage was not executed before a notary public; and that the loan was usurious. Though the date of the filing of the action by Western Savings to foreclose the first mortgage on Parcel 1 is not set forth, it is recognized in the case that the Western Savings foreclosure action was pending during the time that the Inland Western foreclosure action was pending. Inland Western was not successful in a motion for summary judgment.

Thereafter Inland Western, in the same mortgage foreclosure action, secured a writ of attachment directed to the personal property of the defendant corporation,

property utilized in the operation of the guest ranch, and secured a writ of attachment directed to the Parcels 1 and 2. Inland Western also caused several writs of garnishment to issue.

In his deposition the defendant Johnstone admitted the receipt of $40,000, being money he received or payments made on his account.

Inland Western again filed a motion for a partial summary judgment, this time seeking judgment in the sum of $40,000 together with the foreclosure of its writs of attachment and for recovery on the writs of garnishment. After conferences between the then counsel of record, the defendants did not resist the motion for a partial summary judgment and on 17 February 1966 a partial summary judgment containing Rule 54(b), 16 A.R.S. language was entered. Special executions were issued. On 6 May 1966 in consideration of the sum of $40,000 Inland Western assigned its rights under the judgment and assigned the mortgage to Western Savings. Thereafter Western Savings was the bidder at the execution sales.

Western Savings then became the plaintiff and further proceedings were had leading up to the judgment now on appeal. Western Savings agreed that it stood in the shoes of Inland Western and that its rights were no greater than the rights of Inland Western.

It was after Western Savings entered the litigation that the present counsel became the attorneys of record.

Prior to the trial of the issues the defendants further urged that Inland Western was not a holder in due course and that the partial summary judgment was an accord and satisfaction terminating all monetary liability from the defendants to either Inland Western or its assignee Western Savings. The defendants also urge that Surety Mortgage had refunded $5,000 to Inland Western and that should a further recovery be had, the $5,000

should be credited against that recovery. Daughtry explained the $5,000 as follows:

"Q  But Johnson agreed that he would pay you $5,000.

"A  Yes.

"Q  And what was the purpose of that?

"A  Well, we had paid $45,000 for the mortgage on the representations that had been made to us. Mr. Johnson[1] after having made the payment then contested the mortgage under various claims. And it became obvious that it was going to be drawn out for some time. And I had contacted him and I said, 'It looks like we have an opportunity to get part of our money back, but since you brought this in to us and sold it to us we think you ought to cough up the rest,' and he agreed to it."

### THE 60-DAY RULE

It was more than 60 days after the issues had been taken under advisement before the trial court announced its decision that Western Savings would receive no additional recovery, this announcement by a minute entry order. Western Savings filed a motion for new trial and for the first time urged the 60-day rule contending that with the expiration of the 60-day period the trial court had lost jurisdiction. Western Savings acknowledged that it had given thought to taking some action after the 60 days had expired and that it had concluded to take no action.

The 60-day rule is found in the pre-1960 Article VI of our Constitution as § 15, A.R.S. The constitutional provision was supplemented by statutory provisions. With the 1960 revision of Article VI the 60-day rule was carried forward in § 21 thereof. The substance was not changed. The present constitutional provision is supplemented by Rule 39(j) and Rule 77(i) of the Rules of Civil Procedure, 16 A.R.S., as well as by Rule 13 of the Uniform Rules of Practice, 17 A.R.S.

---

1. This name should be Johnstone.

Our Supreme Court had occasion to consider the effect of the pre-1960 constitutional provision and supplementing statutes in Williams v. Williams, 29 Ariz. 538, 243 P. 402 (1926); Malcolm v. Valley Bank Adjustment Company, 31 Ariz. 284, 252 P. 190 (1927); Johnson v. Johnson, 46 Ariz. 535, 52 P.2d 1162 (1935); and Cahn v. Schmitz, 56 Ariz. 469, 108 P.2d 1006 (1941). The sum of these cases is that the 60-day rule is directory and not jurisdictional.

In the post-1960 era in the case of Klinger v. Conelly, 2 Ariz.App. 169, 407 P. 2d 108 (1965), the Court held that the failure to decide within the 60-day period could not be raised for the first time on appeal. Western Savings urges that in Brown v. Brown, 10 Ariz.App. 388, 459 P. 2d 115 (1969), the Court held the rule to be mandatory. This opinion was vacated by the Supreme Court in the case bearing the same title and reported 105 Ariz. 273, 463 P.2d 71 (1969), wherein the Supreme Court did not comment as to the nature of the rule.

■ We agree that the rule mandates[2] decisions within 60 days but we hold that failure to so rule does not deprive the trial court of jurisdiction. What then is the remedy? The parties should make a record in the trial court before the decision is announced by the trial court urging compliance with the rule. There are two cases which are illustrative of a means of securing a ruling, even though neither appears to be a 60-day rule matter. In Itule v. Farley, 94 Ariz. 242, 383 P.2d 127 (1963), the trial judge was mandated to enter an order of transfer. We quote from Morgan v. Hays, 102 Ariz. 150, 426 P.2d 647 (1967), cert. denied 389 U. S. 859, 88 S.Ct. 105, 19 L.Ed.2d 125:

"After a hearing lasting four days, respondent (judge) took the motion under advisement, and advised counsel that he was declining to rule upon the jurisdictional questions in advance of trial, and that the jury trial on the issue of common law negligence and damages would proceed. MGM then filed a petition for a writ of mandamus with this court. We granted a peremptory writ on June 17, 1964, which commanded respondent:

'* * * forthwith to rule on the matter of jurisdiction of said court in the above-entitled matter before proceeding to trial.'

"By order of June 17, 1964, respondent granted MGM's motion to dismiss for lack of jurisdiction, * * *." 102 Ariz. at 151, 426 P.2d at 648.

## USURY

■ At the time of the execution of the note the maximum legal rate of interest was 8% per annum. Literally within hours after the note in the principal sum of $50,000 carrying 8% interest was executed the defendants received money and benefits, including proper charges by Union Title for its services, in the sum of $40,000. Even if we were to assume that the finder's fee was a proper charge and that Surety Mortgage was in fact the lender, although from the evidence it appears that no Surety Mortgage money was involved and that Surety Mortgage was merely a conduit for the processing of the note and mortgage, we fail to find any justification for this enormous difference between the face amount of the note and the borrower's realization therefrom. In Grady v. Price, 94 Ariz. 252, 383 P.2d 173 (1963), our Supreme Court made the following observations.

"A lender, in addition to the highest rate of interest, may charge the borrower reasonable fees for services rendered in connection with the loan, or require reimbursement of expenses incurred, such as the examination of title, recordation

---

2. In our opinion it is not material whether one states that the rule "directs" or states that the rule "mandates". The effect is the same and the failure of a trial judge to enter a ruling within 60 days after submission does not divest the trial court of jurisdiction.

of papers, and perhaps traveling expenses and other similar expenses. (Citations omitted.) But such charges must be limited to specific services rendered and expenses incurred, and may not be made a device through which additional interest or profit on the loan may be exacted, * * *

\* \* \* \* \* \*

"It is not necessary to show that the appellants were conscious of the illegality of the transaction. 'It is sufficient [to show] that the loan contract unequivocally calls for an excessive rate of return on the indebtedness. In such case, the intent of exact usury is presumed.' " 94 Ariz. at 256–257, 383 P.2d at 176.

In Altherr v. Wilshire Mortgage Corporation, 104 Ariz. 59, 448 P.2d 859 (1968), our Court stated:

"Once it appears, prima facie, that the legal maximum interest rate is exceeded—as here—the burden is on the receiver of the excess to show that it represents the reasonable value of services rendered." 104 Ariz. at 64, 448 P.2d at 864.

The record discloses a solid basis upon which the trial court could have determined that the loan was usurious.

## HOLDER IN DUE COURSE

■ Western Savings urges that Inland Western was a holder in due course. The contentions in this respect are controlled by the law as it existed prior to the adoption of the Uniform Commercial Code. We quote two sections of the Arizona Revised Statutes as they then existed:

"§ 44–452. What constitutes a holder in due course

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That it is complete and regular upon its face;

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

"§ 44–456. What constitutes notice of defect

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or *knowledge of such facts that his action in taking the instrument amounted to bad faith.*" (Emphasis added).

We recognize that there are factual differences between the case at bar and Torosian v. Paulos, 82 Ariz. 304, 313 P.2d 382 (1957). Nevertheless we believe that Torosian establishes that not every transferee of a negotiable instrument can hide from the surrounding facts and circumstances. We quote portions of the Torosian opinion.

"It cannot be denied that the trial court was fully justified in concluding Dragonette intended through devious means to defraud his creditors, but to prove that the intervenor, Torosian, had notice of this purpose presented plaintiffs with a more difficult problem that could only be solved by *adducing circumstantial evidence coupled with inferences properly deducible therefrom.*

"We now review the evidence which the trial court concluded tended to show that intervenor was not a holder in due course, i. e., *that he knew or should have known* of Dragonette's intent to hinder, delay or defraud his creditors. (Emphasis added).

\* \* \* \* \* \*

"To be a holder in due course one must, among other things, purchase an instrument in good faith and without notice of any infirmity in the instrument or de-

fect in the title of the person negotiating it." 82 Ariz. at 311, 313 P.2d at 387.

\* \* \* \* \* \*

"Such knowledge on the part of the transferee may be shown by circumstantial evidence, i. e., evidence of suspicious circumstances." 82 Ariz. at 312, 313 P.2d at 387.

\* \* \* \* \* \*

" \* \* \* but as a transferee he could not protect himself by ' \* \* \* choosing to remain ignorant of what the necessities of his case required him to know \* \* \*.' " 82 Ariz. at 313–314, 313 P.2d at 389.

Daughtry and Johnson set up the transaction at a time when the defendant Johnstone was reluctant to mortgage Parcel 2. The money which Inland Western paid for the note went not to its assignor Surety Mortgage but directly into the escrow in Union Title. Daughtry expected Surety Mortgage to make a profit. Daughtry exacted and received from Surety Mortgage a $5,000 note to make Inland Western whole on its investment when it became apparent that the litigation was going to be protracted, even though the note was negotiated to Inland Western without recourse. The title policy on direction of Daughtry was issued directly to Inland Western.

Under all these circumstances the trial court could have held that Inland Western was not a holder in due course and that Inland Western was subject to the same defenses as though Inland Western had been the payee in the first instance.

ACCORD AND SATISFACTION

After the denial of the first Inland Western motion for summary judgment there was discussion as to the amount which the defendant Johnstone would pay. There still existed numerous defenses which the defendants sincerely believed to be valid defenses. Inland Western proceeded with its attachments and garnishments. Finally the entry of judgment in the sum of $40,000 together with the foreclosure of the attachments was agreed upon through the format of not resisting Inland Western's second motion for summary judgment. The defendants urge that there was an accord and satisfaction brought to its final conclusion at the sheriff's sale where at Western Savings, the then owner of the questioned mortgage, bid in the property covered by the mortgage.

There was a difference of opinion between counsel who negotiated the entry of the summary judgment as to the consideration for the failure to resist the second motion for summary judgment. Green v. Huber, 66 Ariz. 116, 184 P.2d 662 (1947), and Bickart v. Greater Arizona Savings and Loan Association, 103 Ariz. 166, 438 P.2d 403 (1968), discussed an accord and satisfaction. In Bickart the court recognized that as between the parties to a note, which would apply equally to the maker and the then holder thereof, the note may be varied or discharged by a new oral agreement.

Western Savings strenuously objected to the oral testimony in view of the fact that the summary judgment was entitled "Partial Judgment", in view of the fact that it contained Rule 54(b) language and in view of the fact that it had become final when the oral evidence was received. Western Savings urged that to receive the evidence was a collateral attack on the judgment and was an effort to impeach the judgment. The defendants acknowledged the finality in terms of the judgment and in our opinion the trial court was correct in receiving the evidence. We believe that Western Savings' objections were not well founded.

■ Based on the record, the trial court could have found an accord and satisfaction.

One remaining question has been presented. Western Savings urges that Rule 80(d) of the Rules of Civil Procedure precludes the consideration of the oral testi-

mony used to establish the accord and satisfaction. This Rule is as follows:

"80(d) Agreement or consent of counsel or parties. No agreement or consent between parties or attorneys in any matter is binding if disputed, unless it is in writing, or made orally in open court, and entered in the minutes."

In Hackin v. Rupp, 9 Ariz.App. 354, 452 P.2d 519 (1969), the Court stated that the rule must be strictly construed.

This rule was not urged until the motions for new trial. The oral testimony did not seek to impeach or change the summary judgment. Under these circumstances we find no violation of the rule.

From a review of the record we find the presence of evidence upon which the trial court could have properly entered the judgment which was entered.

Affirmed.

CASE and DONOFRIO, JJ., concur.