662 P.2d 149

**FLAGSTAFF MORTUARY, INC., an Arizona corporation, Plaintiff-Appellant,**

v.

**Don GAMBLE and Margaret Gamble, husband and wife, Defendants-Appellees.**

No. 1 CA–CIV 5596.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 13, 1983.

Rehearing Denied Feb. 18, 1983.

Review Denied April 12, 1983.

Mangum, Wall, Stoops & Warden by Gerald W. Nabours, Flagstaff, for plaintiff-appellant.

Fennemore, Craig, von Ammon, Udall & Powers, P.C. by Jerome B. Shultz, George T. Cole, Phoenix, for defendants-appellees.

## OPINION

KLEINSCHMIDT, Judge.

This is an appeal from a grant of summary judgment in favor of the defendants in a suit for negligence and breach of contract brought by an insured against his insurance agent. We affirm the summary judgment.

This suit arose out of a crash of a Cessna 210 aircraft owned by appellant Flagstaff Mortuary, Inc. At the time of the accident the aircraft was insured under a policy issued by American Bankers Insurance Company of Florida. The policy had been obtained for appellant by appellee Don Gamble, an independent insurance agent.

John Cronin, who was piloting the aircraft when it crashed, had been given permission by Richard L. Bagwell, the owner and president of Flagstaff Mortuary, to fly the plane on a round trip between Flagstaff and Phoenix. On the return to Flagstaff from Phoenix the plane crashed. There were no personal injuries but the airplane was badly damaged.

Appellant made a claim against the Bankers policy for the damage to the airplane. The claim was denied and appellant filed this suit against the Gambles, alleging that Don Gamble had agreed to obtain identical insurance coverage to that which had been provided under appellant's previous policy issued by Gulf Insurance Company. The complaint alleged a breach of this agreement on the ground that the Gulf policy would have insured appellant while the Bankers policy did not.

After answering the complaint, appellees filed a motion for summary judgment arguing that the damage to the airplane would not have been covered under the Gulf policy. Appellees contended that three separate provisions in the Gulf policy would have excluded coverage of the airplane accident.

The trial court granted the motion for summary judgment without stating the reason for its ruling. In our review of the trial court's ruling, we will sustain the judgment if we find that it should be upheld on any of the three grounds presented to the trial court. *Western Savings and Loan Ass'n. v. Diamond Lazy K Guest Ranch, Inc.*, 18 Ariz.App. 256, 501 P.2d 432 (1972); *Lawrence v. Valley National Bank*, 12 Ariz.App. 51, 467 P.2d 763 (1970).

We need examine only one issue. The Gulf policy contained a provision excluding coverage for "any operation for which a charge is made." It is undisputed that Bagwell would not have allowed Cronin to use the airplane without payment and that Bagwell was promised $100 before he agreed to allow Cronin to fly the airplane from Flagstaff to Phoenix and back. Appellant argues that the exclusion does not preclude reimbursement for expenses and that an issue of fact is presented regarding whether the $100 constituted a mere reimbursement for expenses rather than a charge for flying the airplane.

We hold as a matter of law that the policy exclusion applies if payment is agreed upon as reimbursement for anything more than the direct operating costs of the flight. We also hold that on the record presented here there is no genuine dispute as to any material fact and that the pay-

ment promised exceeded reimbursement for the direct operating costs of the flight and was therefore a "charge" within the meaning of the policy. The trial court was therefore correct in granting summary judgment for the defendants-appellees.

■ If the words of the exclusion were applied literally there could be little question but that an agreement to pay $100 was a charge. The appellees do not urge such an interpretation and we are referred to no case which construes such an exclusion so rigidly. Since it is unnecessary to do so we express no opinion as to whether reimbursement for the direct costs of a flight constitutes a charge within the meaning of the exclusion. We do find several cases directly on point.

In *Cammack v. Avemco Insurance Co.,* 264 Or. 287, 505 P.2d 348 (1972), the plaintiff allowed certain relatives to fly his airplane. Although plaintiff computed that it cost him $27 per flying hour, he charged these people only $10 per hour, an amount he regarded as defraying the immediate costs of flying the airplane. He did this for reasons of friendship, because his relative allowed him to tie his plane down at the relative's landing strip without charge, and because he thought it was good for his airplane to have it flown. The direct cost of operating the plane, including gasoline, was $7.25 per hour. This type of plane chartered for $17 to $30 per hour. Direct operating costs were defined as those costs which are dependent on the number of hours flown which did not include such things as insurance premiums and depreciation expense. The court observed that this was a non-commercial use and construed the payments to be reimbursement for expenses. It ruled that the use of the plane was not "any operation for which a charge is made." We find *Cammack* instructive for its definition of direct operating costs and for the fact that it does not interpret "charge" as used in the insurance policy in its literal sense. If a flight was for a commercial use in the sense that appellant was in the business of renting its airplane such would certainly not be covered. The

record, of course, does not support such a conclusion.

In *Fidelity & Casualty Co. v. Marion L. Crist and Associates, Inc.,* 248 Ark. 1010, 455 S.W.2d 904 (1970), the prospective purchaser of an airplane offered to pay $15 per hour while flying the plane to determine whether he wanted to buy it. The direct cost of operating the airplane was about $14 per hour. The charter rate for a plane of the same type was about $25 per hour. The case was presented to the jury to resolve if the payment was for the use of the aircraft or whether it was merely reimbursement for the out-of-pocket expense of operation. The jury found in effect that the $15 payment represented reimbursement for expenses rather than a charge. The insurance company argued on appeal that it should have received a directed verdict because the $15 per hour represented a charge. The court affirmed the jury verdict holding that whether the $15 per hour price for the use of the airplane was a "charge" represented a question of fact for the jury.

From the foregoing decisions we extrapolate a simple rule. The payment of anything more than reimbursement for the direct expenses of a flight is a charge and this is true regardless of whether such excess reflects a profit to the airplane owner or merely a reimbursement for indirect costs such as maintenance, insurance or depreciation. We believe that this is consistent with existing law and avoids the complex accounting problems which would arise if the critical factor were the question of whether or not the aircraft owner realized a profit from the transaction.

■ We are aware that several decisions which address this question turn, at least in part, on whether the payment is the *quid pro quo* for the use of the aircraft. *See Houston Fire and Casualty Ins. Co. v. Ivens,* 338 F.2d 452 (5th Cir.1964) and *Pacific Indemnity Co. v. Acel Delivery Service, Inc.,* 485 F.2d 1169 (5th Cir.1973). Here it is undisputed that if payment had not been promised Cronin would not have been allowed to take the aircraft. It is not neces-

sary for us to decide whether the exclusion would apply if a payment which exceeded reimbursement for direct expenses was voluntary.

The evidence before the trial court showed that the $100 exacted for the flight far exceeded the anticipated fuel costs and nearly matched the hourly rate that would be charged for a commercial rental of the aircraft. It showed that a round trip flight between Flagstaff and Phoenix takes approximately one hour and twenty-four minutes. The evidence also showed that the cost of fuel for this flight was approximately $20. No other direct expenses were suggested by the record. There was evidence that an identical airplane could have been rented for $75 an hour including gas and oil which would mean that the total cost for a rental flight would be $105. If Richard Bagwell's testimony that the flight would take two hours is accepted the gas would have only cost $30. The $100 charge would have still exceeded the direct cost of the flight by nearly three and one-third times.

It is quite true that Richard Bagwell testified in his deposition that the $100 was a nominal fee for gas *and maintenance* and that he doubted that the amount agreed upon was enough to permit him to recoup the per-hour expense of operating the plane. He made no attempt to allocate to expenses the portion of the amount which exceeded the cost of gas. It is obvious from this that the $100 was to some extent intended to reimburse the plaintiff for indirect costs of operation including maintenance.

The plaintiff also argues that since the pilot had to turn back once because of bad weather, defendants' fuel cost calculations are too low. This is not persuasive. It is obvious from the record that the fixed amount was for a round trip and problems attributable to bad weather weren't really considered when the flight was arranged. In any event even if the fuel costs were doubled our decision would not be different.

Since the flight made by Cronin would have been excluded from coverage under the Gulf policy because the amount imposed

by the owner for the use of the aircraft was a charge within the meaning of the policy exclusion, we affirm the trial court's granting of summary judgment for appellees. This makes it unnecessary to review the other issues raised by the appeal.

The judgment of the trial court is affirmed.

FROEB, P.J., and GREER, J., concur.