THE FIDELITY & CASUALTY CO. OF NEW YORK
*v.* MARION L. CRIST & ASSOCIATES, INC.

5-5292 455 S. W. 2d 904

Opinion delivered June 15, 1970
[Rehearing denied August 3, 1970.]

*Barber, Henry, Thurman, McCaskill & Amsler,* for appellant.

*Lester & Shults,* for appellee.

J. FRED JONES, Justice. This is an appeal by the Fidelity & Casualty Co. of New York from a judgment of the Pulaski County Circuit Court in favor of Marion L. Crist & Associates on an airplane insurance policy. The question for determination is whether coverage under the policy was excluded by a provision in the policy reading as follows:

> "The coverage afforded by this policy shall not apply while the aircraft is used for any purpose for which the named insured directly or indirectly makes a charge to others, except: No Exceptions."

The motions of both parties for directed verdicts were denied by the trial court and the verdict of the jury, in effect, found that the policy coverage was unaffected by the exclusion under the facts revealed by the evidence submitted. Judgment on the verdict was entered for $9,750, which was the face amount of the policy in the amount of $10,000 less $250 deductible. The judgment also awarded $1,170 penalty and $2,520 attorney's fees. Upon appeal to this court Fidelity & Casualty relies on the following points for reversal:

> "Trial court erred in refusing to direct a verdict for the appellant.
>
> It was error for the Trial Court to give appellee's requested Instruction No. 1, modified.
>
> The Trial Court erred in refusing to give appellant's requested Instruction No. 1."

The factual background, as gathered from the testimony of Lawrence S. Woolsey, secretary-treasurer of the appellee corporation, is as follows: Marion L. Crist & Associates, Inc. is a consulting engineering firm consisting of six associates and was established by Marion L. Crist in 1943. In 1954 Mr. Crist purchased and piloted a new Beechcraft Bonanza E35

model airplane which was also used in connection with company business. Mr. Crist and two other members of the firm were pilots, so when Mr. Crist ceased flying in 1966, he sold the aircraft to the appellee corporate firm. The appellee kept the plane insured, with itself as named insured, and around the first of the year, 1968, it decided to sell the plane and listed it for sale with the Central Flying Service of Little Rock from whom Mr. Crist originally purchased it. Central found several prospects who appeared interested in the plane. Mr. Guy Freeling, Jr. was a neighbor and friend of Mr. Woolsey and he also indicated an interest in purchasing the plane. Mr. Freeling was a member of a flying club and holder of a pilot's license, so he went with Mr. Woolsey to look at the plane and he flew the plane in trying it out. On this one trip Mr. Freeling offered to pay Mr. Bowlin (with flying service where the plane was kept and serviced) directly for the flight fuel used in trying out the plane. This offer was refused by Mr. Woolsey as he preferred to handle the expenses on his credit account with Bowlin, by merely having the plane fully serviced, then signing a ticket and paying later. Mr. Freeling inquired and was told the sale price of the plane, and Woolsey testified that it was understood that Freeling would fly the plane some more in trying it out with the idea of purchasing it. Woolsey testified that Freeling again offered to pay the actual operational expenses of the plane while he was flying it, and Mr. Woolsey says he accepted this offer. He says that the plane was checked over and the oil changed every 25 hours; and that since Mr. Freeling would make flights of very short duration in trying out, and learning to like the plane, it was understood that Mr. Freeling would pay for the expenses of his short trips at the rate of $15 per hour actual flying time as determined by the recording tachometer.

On September 2, 1968, Mr. Freeling had flown the plane, with two of his friends, from Little Rock to Lake Village for the purpose of hunting doves. As the plane took off from the landing strip at Lake

Village for the return trip to Little Rock, it crashed. Mr. Freeling as well as his two companions was killed and the plane was a total loss. The appellant was promptly notified of the loss and on the following day sent its insurance adjuster to Little Rock and he obtained a statement of facts from Mr. Woolsey. The adjuster wrote the statement out in longhand and Mr. Woolsey read and signed it. This written statement was placed in the record and apparently appellant based its motion for a directed verdict more on the statement as written, than on Woolsey's sworn testimony. The written statement recites as follows:

"Mr. Guy Freeling, Executive Vice President of the First American National Bank, North Little Rock, Arkansas became rather remotely interested in buying this aircraft and I worked out a rental agreement with him so that he could rent the aircraft and fly it. On August 21, 1968, he called and wanted to use our aircraft and in accordance with good practice we mutually agreed that he should be checked out in the aircraft before flying it alone. Frankie A. Bowlin, a certified flight instructor employed by Central Flying Service, where the aircraft was based, checked Mr. Freeling out. I went along on the check flight as an observer. I was satisfied in my own mind that Mr. Freeling was very competent in our aircraft. Bowlin commented to me that he was satisfied that Mr. Freeling was very competent to fly the Bonanza. The rental arrangement was that he pay $15.00 per hour for each flying hour per the recording tachometer. We furnished everything—gas, oil, maintenance, storage, etc. This was a sort of promotional price to Mr. Freeling for the purpose of getting him more interested in buying the aircraft from us. We also wanted to use the aircraft more than we had been using it, we had been flying it only about once a month. By renting it to Mr. Freeling we got more use out if it. Mr. Freeling had flown approximately four and one-half hours in our aircraft prior to September 2, 1968. On September 2, 1968, he rented

the Bonanza to take two other men to Lake Village, Arkansas. On taking off from an airport at Lake Village he struck a radio tower with the wing of the Bonanza and crashed. All three occupants of the aircraft were killed. I am not personally acquainted with either of the other two men who were killed. I did not know prior to the crash what the purpose of the trip was. I have since heard that they had gone to Lake Village to dove hunt."

Mr. Woolsey testified that he told the insurance adjuster the facts as he related them to the jury under oath, and that the adjuster wrote down the statement in longhand and he read and signed it. He says that the adjuster employed his own words and phraseology in writing out the statement and that he, Woolsey, did not check the statement for exact words and phraseology. He emphatically denies using the word "remotely" in connection with Mr. Freeling becoming interested in purchasing the aircraft. As to the rental agreement, as set out in his written statement, he testified as follows:

"Q. The statement also is to the effect that, and I am quoting, 'I worked out a rental agreement with him so that he could rent the aircraft and fly it.' Was that the statement you made to this particular adjuster?

A. They were his words, I didn't realize that the word 'rent' had any particular significance, I mean, we had an agreement that he would pay something for the expenses on the airplane, I wasn't smart enough to realize that was the wrong thing to sign.

Q. Whether it was the wrong thing or right thing, did you relate to this particular adjuster the facts concerning Mr. Freeling's use of the plane just like you related to us today?

A. Yes, sir."

On cross-examination Mr. Woolsey again denied using the word "remotely" in the written statement in connection with Freeling's interest in purchasing the airplane. As to the rental agreement, as set out in the written statement, Mr. Woolsey testified on cross-examination as follows:

"Q. Is it not true, Mr. Woolsey, that in that statement that you signed, the statement which you signed said, 'The rental agreement was that he pay Fifteen Dollars per hour for each flying hour per the recording tachometer?'

A. The statement says that, yes.

Q. And that was the agreement which you made, was it not, Mr. Woolsey?

A. The tachometer time was the way we would get the length of time the aircraft had been flown, but it was not a charge I made, it was an offer I accepted for him to participate in the cost of the operation.

Q. That offer which you accepted, was that based upon the time recorded by the tachometer, Mr. Freeling was to pay to Marion L. Crist & Associates, Inc. Fifteen Dollars per hour?

A. Yes.

Q. That was the agreement, was it not?

A. Yes, sir.

Q. How many hours had Mr. Freeling flown this aircraft prior to the time he took off on the September 2 flight?

A. Approximately four hours, he had taken Dr. Crow to Cherokee Village on one occasion,

he had taken Dr. Crow to Arkadelphia on one occasion, as I understand. He had made a local flight checking out the instruments, with his son as a safety pilot, somebody watched while he was flying under the hood, those times I know, approximately four hours or slightly more.

Q. I believe in your statement, prior to the September 2 flight, that Mr. Freeling had flown the plane approximately four and a half hours?

A. Approximately.

Q. And I take it from that, that you or someone on behalf of Marion L. Crist & Associates had kept a record of the hours that were reflected by the tachometer?

A. We had not checked the tachometer, Mr. Freeling merely told us how long he had flown and we entered it on the log we keep at the office.

Q. Further in that statement, Mr. Woolsey, is it not true, the statement which you signed, that you made the statement that on September 2, 1968, that Mr. Freeling rented this Bonanza to take two men to Lake Village?

A. No, sir, I did not say that, the statement says that, but I signed it, the statement.

Q. That was in the statement which you signed?

A. Right."

In his testimony Mr. Woolsey explains the charge of $15 per hour in the following language:

"Q. How did the figure Fifteen Dollars an hour get into this?

A. Mr. Freeling asked me should he pay for the gas and oil and then turn in the tickets to me, and I said, 'No, you are taking short flights, local flights, well within the range of the aircraft's fuel capacity, so do what we do, we don't fill the airplane up on local flights except at the Central ramp and we bring it back to where we keep the airplane and then fill it up,' and I suggested he do this and sign a ticket charged to us and then we would just charge him based on the tachometer time as a method of simplifying all that record keeping, so he wouldn't have to keep a bunch of invoices to what he had spent."

Mr. Claud Holbert testified that he is connected with Central Flying Service whose business is aircraft rental and sales and flying instruction and repair. He says that he is a dealer for Beechcraft and is familiar with the aircraft involved, having sold it originally to Marion Crist. Mr. Holbert testified that the appellee had recently listed the plane with him for sale and that he is familiar with the out of pocket cost in the actual operation of airplanes. He testified that on the particular plane involved, the usual out of pocket flight operation cost would be $14.11 per hour. He testified that this would not be the rental value of the plane, and that the operating cost of $14.11 would not include depreciation and that sort of thing. He testified that the fair rental value of the particular plane being flown by Guy Freeling at the time of his death would be $25 to $27.50 per hour.

Mr. Kenneth Hiegel, a witness called by the appellant, testified that he operates Hiegel Aviation, Inc. and is engaged in buying, selling, renting, repairing and servicing new and used airplanes. As to the rental value of the airplane involved in the case at bar, Mr. Hiegel testified as follows:

"Q. Mr. Hiegel, in your experience in this busi-

ness and in your opinion, based on this experience, what would be the reasonable fair rental value of a 1954 Beechcraft Bonanza?

A. Depending on the equipment that is installed in the airplane, I would say an average 1954 model Bonanza that we are speaking of would, I would personally rent for around Twenty Dollars an hour.

Q. Would Fifteen Dollars an hour be unreasonable in your opinion, as a dealer?

A. Probably that would be a rock bottom minimum and as a dealer, I probably would not rent that airplane for that money, no."

We find no error in the trial court's refusal to direct a verdict for the appellant and we, therefore, find no merit in appellant's first point. In the case of *Houston Fire & Casualty Ins. Co.* v. *Ivens,* 338 F. 2d 452, an aviation insurance policy covered an aircraft only while it was used for personal or family business "excluding any operation for which a charge is made." The insurance company brought suit for a declaratory judgment requesting a determination of its liability under the policy issued to Ivens. Ivens was an independent contractor who owned the insured aircraft and he did independent work for a company of which N. M. Ulsch was president. One Fletcher had purchased from the company an item being manufactured in Tennessee and Ivens agreed to fly Fletcher from Florida to Tennessee to pick up the item. A day or so before the flight Ivens called Ulsch by telephone and asked for a contribution towards the cost of gasoline in making the trip. Ulsch was advised that gasoline for one hour in flight would cost $10, and that the flight would take approximately six hours. Ulsch agreed to contribute $60 toward the trip. In the *Ivens* case, as in the case at bar, evidence was presented that the charter, or rental rate on an airplane of the type involved, would amount to considerably more than the amounts agreed to be

paid and accepted. In *Ivens* the court said:

> "It is the opinion of the Court that when a charge is made for something, there is a distinct connotation that there is a *quid pro quo*. A charge may thus be considered as the price demanded for a thing or service. The agreement of Ulsch was merely the offer of a contribution made to help Ivens defray the cost of the gasoline.
>
> \* \* \*
>
> Based upon the record before it, the Court is of the opinion that the offer of Ulsch to contribute $60.00 toward payment of the cost of the gasoline was not a charge within the meaning of the policy, and that the fatal trip was not an 'operation for which a charge is made.' "

Appellant is correct in its statement that in *Ivens* a "charge" is defined as the price demanded for a thing or service, but the only difference we are able to distinguish between the "charge" made in the *Ivens* case and the one at bar, is that in *Ivens* the amount was $10 per hour and in the case at bar it was $15. As above set out the *Ivens* case reached exactly the opposite conclusion from that urged by the appellant in the case at bar. The appellant says that the court in the *Ivens* case would have considered the $15 per hour charge in the case at bar as within the exclusion provision of the insurance contract. We can draw no such conclusion. The appellant recognizes the $10 per hour in the *Ivens* case was a contribution toward the cost of gasoline as per verbal telephone agreement as testified by Ulsch. The appellant, in effect, asks us to usurp the duty and authority of a jury and hold that the $15 per hour in the case at bar constituted a *charge* within the meaning of the exclusionary clause rather than reimbursement for *expense* as testified by Mr. Woolsey. We are unable to do this.

As to the appellant's second point, the appellee's requested instruction No. 1 was a lengthy one and only that paragraph bearing on the specifically alleged error will be copied here. That part of the instruction as *requested* by the appellee is as follows:

"You are further instructed that the exclusion of coverage under this insurance policy is applicable only if the plaintiff actually made a charge for the use of the aircraft or contracted to make a charge under a binding, legally enforceable agreement."

The appellee's instruction No. 1, *as modified and given* by the court, and with our emphasis on the modification, is as follows:

"You are instructed that within the meaning of the terms of the policy, a 'charge' would be made for the use of the aircraft if it constituted the price demanded and agreed to be paid for the use of the aircraft, *without contingency or qualification.*"

We recognize appellee's instruction No. 1 both as requested, and as modified and given, as being far from an ideal instruction, but we confine our attention to the specific objections stated by the appellant as follows:

"The defendant, Fidelity & Casualty Company, objects generally and specifically to the giving of Plaintiff's Requested Instruction No. 1, being the instruction requested by the plaintiff, as amended, *objecting only to that part of the amendment wherein the Court had inserted the words, 'without contingency or qualification.'* The defendant objects specifically *for the reason that there is no evidence that there was any contingency or that the agreement between Woolsey and Freeling was in any way qualified.* That the parties agreed on Fifteen Dollars an hour and that there was nothing in that agreement with reference to the liability for this charge regardless of whether Freeling did or Freeling did not purchase the aircraft." (Emphasis supplied).

The crux of appellant's argument as to error in this instruction, is that there was no evidence of contingency or qualification that would justify the inclusion of this phrase in the instruction. We do not agree

with the appellant on this point. There was evidence that the $15 per hour agreed upon was reinbursement of expenses rather than charges for the use of the aircraft. Even if the $15 per hour could properly be considered "a charge" within the meaning of the policy, there was evidence that the *purpose* of the use for which the charge was made was to try the aircraft out with a view of purchasing it. There is no substantial evidence that a charge was being made *for that purpose*. On this point Mr. Woolsey testified as follows:

"Q. Did you reach any agreement with Mr. Freeling to rent or charter the plane for him?

A. No, I merely accepted his offer.

Q. Did you make any demand for a particular rental price for the plane?

A. No, he could have had it for nothing as far as we were concerned.

Q. Was there any agreement or understanding of what, if anything, would be paid if Mr. Freeling purchased the airplane?

A. We would not have charged him, we would have forgiven the charges and just applied them against the purchase price, just washed them out if he purchased the airplane, which I thought he was going to do in a few days.

Q. No charge made for that?

A. No charge."

The appellant is correct in its contention that there was no evidence of "contingency or qualification" that $15 per flight hour was the *amount* Freeling agreed to pay and the appellee agreed to accept. The amount of money which Freeling agreed to pay and the appellee agreed to accept is not in issue and is not the im-

portant question in this case. The important question is what was the $15 per hour *paid for*. Was it for use of the aircraft and did the appellee charge that amount for the *use* of the aircraft, or did the appellee receive, either by charge or acceptance, that amount for reimbursement of the actual out of pocket expenses in the cost of operating the aircraft during the period of time Freeling did operate it? Woolsey answers this last question in the affirmative, and the additional testimony of Holbert and Heigel as to the cost of operating the plane, and the average cost of rental, lends weight and corroboration to Woolsey's testimony that the $15 per hour to be paid by Freeling was not a charge made for the *use* of the aircraft at all, but was for reimbursement of expenses in its operation. So we hold that appellant's second point is without merit.

As to appellant's third and last point, we conclude that the trial court did not err in refusing to give appellant's instruction No. 1 as requested. Appellant's requested instruction No. 1 is as follows:

"Contracts of insurance, like other contracts, are to be construed according to sense and meaning of terms which parties have used, and if they are clear, their terms are to be taken and understood in their plain, ordinary and popular sense."

This instruction correctly tells the jury how contracts of insurance are to be construed when the sense and meaning of the terms which the parties have used *are clear;* but it does not tell the jury how a contract of insurance is to be construed when the meaning of the terms employed is *not clear*. We are of the opinion that the contract here falls in the second classification, and we find no error in refusing to give the appellant's requested instruction No. 1 as requested.

The appellant cites *State Farm Mutual Auto Ins. Co. v. Pennington*, 324 F. 2d 340, for the proposition that "contracts of insurance, like other contracts are to be

construed according to sense and meaning of terms which parties have used, and if they are clear, their terms are to be taken and understood in their plain, ordinary and popular sense." The *Pennington* case is so applicable to both sides of the question in the case at bar, we feel justified in quoting all of paragraphs [3-5] from the Pennington decision as follows:

"Provisions of a policy of insurance are construed most strongly against the insurance company that prepared it, *Travelers Indemnity Company* v. *Hyde*, 232 Ark. 1020, 342 S. W. 2d 295 [1961]. While it is true that the Court resorts to such rule of construction when there is ambiguity, the rule is equally well established that, where no ambiguity exists, the Court is not required to use a forced construction which is plainly outside the language of the policy. *McKinnon* v. *Southern Farm Bureau Casualty Ins. Co.*, 232 Ark. 282, 335 S. W. 2d 709 [1960]. Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense. *State Farm Mut. Automobile Ins. Co.* v. *Belshe*, 195 Ark. 460, 112 S. W. 2d [1938].

This Court has stated, in *Jefferson Insurance Co. of Pine Bluff, Ark.* v. *Hirchert*, 281 F. 2d 396 [1960]:

'The law of Arkansas relative to the construction of insurance contracts apparently differs in no respect from that almost universally applied. Mr. Justice Sutherland, in *Bergholm* v. *Peoria Life Ins. Co.*, 284 U. S. 489, 492, 52 S. Ct. 230, 231, 76 L. Ed. 416, stated the rule as follows:

* * * It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. * * * This canon of construction is both reasonable and

just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings.

Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary and popular sense. * * *' ''

The appellant cites several other cases for the proposition that where there is *no ambiguity* in an insurance policy contract, it is the duty of the courts to interpret the provisions of the contract according to the plain import of its language as is done in other types of contracts. Each of the cases cited also holds that insurance policies are to be liberally construed in favor of the insured, and that where the language of the policy *is ambiguous,* the contract is construed most strongly against the insurance company that prepared it.

The judgment of the trial court is affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting in part. I disagree with the majority in this case only on the points relating to the jury instructions.

Plaintiff's requested instruction No. 1 seems to have been a reasonably proper declaration of the law applicable to the facts and the policy clause involved. I think that the modification was error. Nowhere in that clause is there any statement from which it could be said that the exclusion applied only if the charge was a price demanded and agreed to be paid, *without contingency or qualification.* There was only a question of fact as to whether appellee made a "charge"

for the use of the plane or merely sought reimbursement for expenses. There was no evidence that the agreement between the parties encompassed any understanding that the "charge," if it was a charge under the terms of the policy, would be forgiven if Freeling did buy the plane. Any "ex post facto" statements of intention by the secretary-treasurer of the corporate appellee-plaintiff are wholly irrelevant. Yet, it seems to me that the court's addition of the words "without contingency or qualification" inevitably led the jury to conclude that the real issue was what appellee might subsequently have decided to do about the charge in later bargaining with a prospective purchaser. I respectfully submit that the majority opinion does not answer the critical question, but avoids it.

I also feel that appellant's requested instruction No. 1 should have been given. The majority concedes it to be a correct declaration of the law. Fault is found in its failure to state a related principle of law in the construction of insurance policies. Of course, a single correct instruction, which is not binding, is not required or expected to state all the law involved. If appellee had desired revelation of the "other side of the coin" he might have requested such an instruction. See *St. Louis, I. M. & S. Ry. Co. v. Smith*, 82 Ark. 105, 100 S. W. 884.

I would reverse the judgment for errors in the instructions as stated herein.