AMERICAN EAGLE INSURANCE COMPANY, Plaintiff,

v.

RUTLAND AREA FLYERS, INC., David Leggett and Lindley H. Leggett, IV, Co-Administrators d.b.n., c.t.a., of the Estate of Lindley H. Leggett, III, and Jacque Smith, individually and as Co-Executor of the Estate of Nancy Leeson Smith, Defendants.

Jacque SMITH, individually and as Co-Executor of the Estate of Nancy Leeson Smith, Plaintiff-in-Cross-Claim,

v.

David LEGGETT and Lindley H. Leggett, IV, Co-administrators d.b.n., c.t.a., of the Estate of Lindley H. Leggett, III, Defendants-in-Cross-Claim.

No. 2:96-CV-18.

United States District Court, D. Vermont.

Dec. 19, 1996.

244

Robert Gaynor Cain, Paul, Frank & Collins, Inc., Burlington, VT, Bruce R. Wildermuth, Mendes & Mount, New York City, for American Eagle Insurance Company.

William D. Cohen, Abell, Kenlan, Schwiebert & Hall, P.C., Rutland, VT, for Rutland Area Flyers, Inc.

Melvin Bauer Neisner, Jr., Killington, VT, for David Leggett, Lindley H. Leggett, IV.

John E. Brady, Richards and Brady, Springfield, VT, Melvin Bauer Neisner, Jr., Killington, VT, William Hewig, III, Kopelman & Paige, Boston, MA, for Lindley H. Leggett.

Daniel L. Burchard, McCormick, Fitzpatrick, Kasper & Burchard, Burlington, VT, Michael D. Weisman, Robert F. Schwartz, Hill & Barlow, Boston, MA, for Jacque Smith.

Robert Gaynor Cain, Paul, Frank & Collins, Inc., Burlington, VT, for American Eagle Insurance Company.

Melvin Bauer Neisner, Jr., Killington, VT, William Hewig, III, Kopelman & Paige, Boston, MA, for David Leggett, Lindley H. Leggett, IV.

*OPINION AND ORDER*

SESSIONS, District Judge.

This is a diversity action filed by Plaintiff American Eagle Insurance Company ("American Eagle"), against Defendants Rutland Area Flyers ("Rutland Flyers"), David Leggett and Lindley H. Leggett, IV ("Leggett Estate"), and Jacque Smith ("Smith" or "Mr. Smith"), for declaratory judgment as to its rights and responsibilities under an insurance policy ("policy") issued by American Eagle covering a 1976 Cessna 172 airplane owned by Rutland Flyers. In addition, Rutland Flyers has filed a counterclaim against American Eagle requesting declaratory judgment in its favor, compensatory damages for the value of the plane, and punitive damages for American Eagle's bad faith denial of coverage; Smith has filed a cross-claim against the Leggett Estate for negligence and wrongful death; the Leggett Estate has counterclaimed against American Eagle for breach of contract and bad faith denial; and Rutland Flyers has cross-claimed against the Leggett Estate for damage to the plane. Pending before the Court are: (1) Plaintiff-in–Cross–Claim Smith's motion for partial summary judgment on the cross-claim against the Leggett Estate; and (2) Smith and American Eagle's cross-motions for summary judgment. For the reasons discussed below, Smith's motion for partial summary judgment is GRANTED and Smith and American Eagle's motions for summary judgment are DENIED.

*I. Factual Background*

This is an action in diversity arising out of a plane crash which occurred in October, 1995 in Norwich, Vermont. Plaintiff American Eagle, a Texas corporation with its principal place of business in Dallas, Texas, is an insurance company authorized to conduct business in the State of Vermont. Rutland Flyers is a Vermont corporation with its principal place of business in Rutland, Vermont. Defendant David Leggett is a co-administrator of the estate of Lindley H. Leggett, III ("Leggett"), and is a resident of the State of New Jersey. Defendant Lindley H. Leggett, IV is also a co-administrator of Leggett's estate and is a resident of the State of Florida. Leggett's estate is being probated in the Rutland District Probate Court in the State of Vermont. Defendant Jacque Smith is a resident of Massachusetts. He is also co-executor of the estate of Nancy Leeson Smith ("Mrs. Smith").

Leggett was a member and the president of the Rutland Flyers, a Vermont flying club. In addition, Leggett owned and operated an aerial photography business, Skyview Photography, Ltd. Leggett held a private pilot's license and a Class III Medical Certificate. On October 12, 1995, Leggett flew a 1976 Cessna 172 single-engine aircraft, owned by the Rutland Flyers, from Rutland, Vermont to the West Lebanon Airport in New Hampshire, where he met Mr. and Mrs. Smith ("the Smiths"). The Smiths had arranged with Leggett to fly over a house and surrounding property in Norwich, Vermont owned by their friends Jim and Betsy Wooster (the "Wooster property"), so that the Smiths could photograph the property. The Woosters' son James had previously contacted Mrs. Smith and asked if she could have aerial photographs taken of his parents' house as an anniversary present. Mrs. Smith reached an agreement with Leggett regarding the payment of a sum of money, but Mr. Smith did not know the details of the financial arrangement.

Leggett met with the Smiths at the West Lebanon Airport at approximately 11:00 a.m. At approximately 11:35 a.m., after a briefing from Leggett, the plane departed from the West Lebanon Airport with Leggett piloting

the aircraft, Mrs. Smith in the right front passenger seat, and Mr. Smith in the seat directly behind her.

Leggett flew the plane north along the Connecticut River, and then turned west to pass over the Wooster property. As they flew over the property, the Smiths took pictures from a side window, Mr. Smith using his own camera, and Mrs. Smith using Leggett's Hasselblad camera and gyro-stabilizer. Leggett took no photographs. Soon after passing over the Wooster property, the plane flew into nearby trees, causing it to crash. Leggett and Mrs. Smith were both killed in this tragedy. Jacque Smith suffered serious injuries, but survived the crash.

In the wreckage of the crash, investigators found a piece of paper in Mrs. Smith's handwriting, on which was written information about Leggett's Hasselblad camera and related photography equipment, as well as the Cessna which Leggett flew on October 12, 1995. In addition, the piece of paper contained the following notation: "$90 to Norwich from Rutland for pilot & plane," with the word "gyrostabilizer" written immediately below. The names of other aerial photographers were written on the same piece of paper. Film, cameras, camera bags, and a gyro-stabilizer were also found at the site.

Rutland Flyers permitted its members use of the Cessna, subject to certain charges. It charged its members $31.00 per hour for use of the Cessna. This charge was assessed for each hour the aircraft's engine was running, as measured by the plane's tachometer. Members were charged an additional $80.00 per month in membership dues for certain operating costs. Leggett's membership in the Rutland Flyers permitted his aerial photography business regular use of the group's 1976 Cessna 172 single-engine aircraft. All of the members of the Rutland Flyers were aware of Leggett's use of the group's Cessna for business purposes. In addition, Rutland Flyers held an insurance policy issued by American Eagle covering the Cessna, its pilots, and its passengers for the period from December 24, 1994 to October 12, 1995.

On January 16, 1996, American Eagle filed a complaint against Rutland Flyers, the Leggett Estate, and Mr. Smith, seeking declaratory judgment as to its rights and responsibilities under the policy, including whether it must reimburse Rutland Flyers for hull damage to the aircraft, and whether it has a duty to defend or indemnify Rutland Flyers or the Leggett Estate for any action brought against them arising out of the accident.

On February 23, 1996, Rutland Flyers counterclaimed against American Eagle requesting declaratory judgment in its favor, compensatory damages for the value of the plane, and punitive damages for American Eagle's bad faith denial of coverage.

On February 26, 1996, Smith cross-claimed against the Leggett Estate for negligence and wrongful death, seeking $1 million in compensatory damages, $1 million in punitive damages, as well as attorney's fees and costs.

On February 29, 1996, the Leggett Estate counterclaimed against American Eagle for breach of the insurance contract and for bad faith in denying coverage on the claim.

On April 12, 1996, Rutland Flyers cross-claimed against the Leggett Estate alleging that it is liable for the property damage to the plane. Rutland Flyers claims that its insurance policy with American Eagle covers damage to the plane up to $25,000.00, but that its losses total $59,864.00. It therefore seeks to recover the deficiency of $34,864.00 from the Leggett Estate.

Smith filed a motion for partial summary judgment on the cross-claim against the Leggett Estate on June 13, 1996. The Leggett Estate opposes this motion. In addition, Smith filed a motion for summary judgment against American Eagle on August 28, 1996. American Eagle filed an opposition to this motion, as well as its own motion for summary judgment on September 30, 1996.

## II. Discussion

This matter is before the Court on motions for partial summary judgment against the Leggett Estate and for summary judgment against American Eagle by Defendant and Plaintiff–in–Cross–Claim Smith, and on motion by Plaintiff American Eagle for summary judgment as against all Defendants. Each motion is treated in turn.

*A. Standard of Review*

Summary judgment is appropriate when the Court finds that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The party opposing summary judgment may not rest on its pleadings but must present "significant probative evidence" demonstrating that a genuine dispute of material fact exists, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The Court must view these materials in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor. *Id.* at 255, 106 S.Ct. at 2513–14.

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those parts of the record which demonstrate absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met its burden, the nonmovant may not rely on conclusory allegations or mere conjecture, but rather must offer specific facts to support a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (construing Fed.R.Civ.P. 56(e)). As to any claim, or essential element thereof, for which the non-moving party bears the burden of proof at trial, the nonmoving party must make a showing sufficient to establish the existence of that claim or element.

*B. Plaintiff–in–Cross–Claim Smith's Motion for Partial Summary Judgment*

█ In his motion for partial summary judgment against the Leggett Estate, Smith contends that there is no genuine dispute as to the fact that (1) Leggett had a duty to the Smiths, and (2) pilot error was the cause of the crash. The question of the duty owed to the Smiths is in fact uncontested. However, the Leggett Estate claims that there is a genuine dispute as to the cause of the crash.

Smith's argument that the crash was caused by pilot error is based on his personal observations during the flight and immediately prior to the crash and the deposition testimony of several witnesses. Smith alleges that the plane had just completed its first pass over the Wooster property when Smith stopped taking pictures and looked forward. He saw the plane flying directly toward trees, and told Leggett to "pull up." Smith Dep. at 90 (Paper No. 65 Ex. 7) Smith alleges that the plane continued straight ahead, striking the trees and ultimately crashing. He alleges further that there was no change in wind conditions or engine noise just prior to the crash.

In addition, Smith relies upon the opinions of American Eagle employee Jo Ann Storie, and Smith's designated and proposed expert, David Vos, both of whom have concluded that the crash was caused by pilot error. In her deposition, Storie testified that American Eagle had no evidence of any mechanical malfunction of the plane. In his affidavit, Vos states that the plane's wing flaps were not deployed, indicating that Leggett was not flying the plane at maximum lift. Vos states further that a pilot flying slowly at low altitudes would normally have deployed the wing flaps in order to achieve maximum lift. On the basis of the physical evidence, and taking into account Smith's personal testimony, Vos concludes that pilot error caused the crash.

Finally, Smith points to the deposition testimony of James T. Cain, an NTSB investigator, and William B. Welch, Cessna Aircraft Company's air safety investigator, both of whom investigated the October 15, 1995 crash. Both found that the aircraft's wing flaps were not deployed, and that the throttle was pulled back from the full-power position by one and one-quarter inches, findings that Smith alleges support his contention that pilot error was the cause of the crash. In addition, both inspected the aircraft and found no mechanical defect.

The Leggett Estate controverts Smith's telling of the story by arguing that a genuine dispute exists as to whether the airplane experienced any engine or mechanical problems immediately before the crash. In addi-

tion, the Leggett Estate argues that a dispute exists as to whether the crash wreckage may be relied upon to show the position of the wing flaps just prior to the accident. With regard to the possibility of engine or mechanical problems just prior to the crash, the Leggett Estate relies on certain statements of Smith and eyewitnesses of the crash. In particular, the Leggett Estate draws the Court's attention to: (1) a recorded statement of Smith that just before the accident the pilot was "intently looking at the instruments or listening for something ...," Smith Statement at 2 (Paper No. 43 Ex. F); (2) a statement of a witness who said, "I heard the engine sputter and die and then I heard it crash," Richardson Statement (Paper No. 81 Ex. D); *see also* Richardson Affidavit (Attachment to Paper No. 116); and (3) a statement of another witness who stated, "The engine didn't sound right. The engine sounded too loud for a small plane. The plane was very noisy." Hahn Statement (Paper No. 81 Ex. D).

With regard to the condition of the aircraft wings after the crash, the Leggett Estate relies on the deposition testimony of James Cobb, a Ryan Insurance Services employee working for American Eagle, who testified that photographs taken soon after the crash` show the aircraft with one flap up and one flap down. This testimony conflicts with the respective testimonies of Smith's expert witness Vos, Allen Ryan, claims representative for American Eagle's insurer, Ryan Insurance Services, NTSB investigator Cain, and Cessna Aircraft investigator Welch. On the basis of this conflicting testimony, the Leggett Estate posits that there exists a genuine dispute about a material fact, namely, the position of the wing flaps just prior to the crash. This is a material fact, the Leggett Estate contends, because the position of the wing flaps would be probative of Leggett's final maneuvers, and therefore would be probative of the ultimate question of whether the crash was due to pilot error.

It is clear from the evidence presented to the Court that no genuine dispute as to a material fact exists in this case. When the deposition testimony of Mr. Smith is considered in conjunction with the observations and opinions of three experts—Smith's designated expert Vos, NTSB investigator Cain, and Cessna investigator Welch—an inference of pilot error is not only possible, it is essentially inescapable. In the face of this evidence, the Leggett Estate has failed to create sufficient doubt as to material facts in the case.

Rather than direct the Court to "specific facts" showing the existence of a disputed material fact as required by Rule 56(e), the Leggett Estate has produced only speculation as to a cause of the plane crash other than pilot error. The Court is unable to draw a reasonable inference of mechanical or engine failure from any of the evidence presented by the Leggett Estate. For example, the statement that just prior to the crash Leggett was "intently looking at the instruments or listening for something ..." is too ambiguous to permit an inference in favor of the Leggett Estate's position. Similarly, statements that the plane "didn't sound right" and was "very noisy" do not, without the aid of considerable conjecture, demonstrate a dispute as to the cause of the crash. Even the eyewitness's statement, "I heard the engine sputter and die and then I heard it crash," does not create a disputed factual question. In fact, the statement is not inconsistent with Smith's contention of pilot error because, according to Smith's theory of the case, the plane may have been flying so slowly as to stall just prior to crashing. The Leggett Estate has failed to produce anyone, whether expert or lay person, who has posited with any specificity what other than pilot error caused the accident. The Leggett Estate has therefore relied on conclusory allegations and mere conjecture, thereby failing to meet its burden as the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (construing Fed.R.Civ.P. 56(e)).

The Court need not address the question of whether a material factual dispute exists regarding the wing flaps because the condition of the wing flaps was only one factor on which Smith's experts base their conclusions. Even if a genuine dispute exists as to the wing flap positions, there is no genuine dispute as to the cause of the crash. Put anoth-

er way, in light of the overwhelming evidence mitigating in favor of pilot error, the condition of the wing flaps is not material to the case.

Because no factual dispute exists regarding the cause of the crash, Plaintiff–in–Cross–Claim's motion for partial summary judgment is GRANTED.

### C. Plaintiff American Eagle and Defendant Smith's Cross–Motions for Summary Judgment

#### 1. Plaintiff's Grounds for Denial: Exclusions or Conditions Precedent?

■ American Eagle seeks to deny coverage under several provisions of the policy issued to Rutland Flyers. The policy and the applicability of these specific provisions is therefore at the crux of both Smith and American Eagle's motions for summary judgment. This gives rise to a preliminary question of whether each of the grounds for denial of coverage averred by American Eagle is an exclusion or a condition precedent. This inquiry is determinative of who bears the burden of proof regarding the applicability of each of the grounds.

American Eagle bases its argument for denial of coverage on two grounds: first, American Eagle argues that the October 12, 1995 flight falls under the policy's "use of aircraft" clause; and second, Leggett did not have the proper pilot's certificate or medical certificate under the Federal Aviation Rules for a flight carrying passengers for "compensation or hire," as required by the policy's "pilot experience" clause. American Eagle contends that each of these grounds is a condition precedent to coverage under the policy. In contrast, Smith argues that each ground is in fact an exclusion from coverage, and denies that such exclusions apply in this case.

■ A condition precedent is a condition which must happen or be performed in order for a contract to come into effect. *Title Guaranty & Sur. Co. v. Nichols*, 224 U.S. 346, 350, 32 S.Ct. 475, 476, 56 L.Ed. 795 (1912); *see also* Corbin on Contracts § 628 (West 1960) ("Conditions precedent ... are those facts and events, occurring subsequent-

ly to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.") Thus, the contract is not binding upon the parties until the condition precedent is satisfied. Moreover, the insured must affirmatively allege the performance or occurrence of a condition precedent, and he or she bears the burden of proof on this factual issue. *Houran v. Preferred Accident Ins. Co.*, 109 Vt. 258, 270–71, 195 A. 253 (1937). In contrast, an exclusion "is a means employed by the insurer to protect itself from an additional risk or hazard against which it does not wish to insure without the payment of an additional premium." *Jarman v. Export Ins. Co.*, 59 Tenn. App. 245, 439 S.W.2d 785, 789 (1968). An exclusion therefore presumes the existence of a valid contract between the parties but excepts the insurer from certain types of liability. In cases involving exclusions from coverage, the burden of proof is on the insurer to show that the facts of the case fall within the bounds of the exclusion. *Reynolds v. John Hancock Life Ins. Co.*, 117 Vt. 541, 545–46, 97 A.2d 121 (1953).

The Vermont Supreme Court has provided clear guidance on questions of insurance contract interpretation such as those presented in this case. *Northern Security Insurance Co. v. Hatch*, —— Vt. ——, 683 A.2d 392 (1996), a recent Vermont Supreme Court case, articulates the current law in Vermont and is worthy of quotation at some length:

> Rules for interpreting insurance contracts in Vermont are well established. An insurance policy must be interpreted according to its terms and the evident intent of the parties as expressed in the policy language. *City of Burlington v. National Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994). Disputed terms are to be read according to their plain, ordinary, and popular meaning. *Id.* at 127–28, 655 A.2d at 721. Any ambiguity in an insurance contract must be construed in favor of the insured. *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 367, 610 A.2d 132, 134 (1992). The insurer, however, should not be deprived of unambiguous provisions

put into a policy for its benefit. See *Peerless Ins. Co. v. Wells,* 154 Vt. 491, 494, 580 A.2d 485, 487 (1990).

683 A.2d at 394. Thus, in deciding whether the clauses in question are conditions precedent or exclusions, the Court must decide whether the disputed clauses are "unambiguous." If ambiguity exists as to the meaning of the clauses, they must be construed in favor of the insured, Smith, and therefore the clauses must be construed as exclusions from coverage.[1]

As stated by the court in *Northern Security Insurance,* "[a]n insurance contract is ambiguous if 'it is reasonably or fairly susceptible of different constructions.'" 683 A.2d at 395 (quoting *Town of Troy v. American Fidelity Co.,* 120 Vt. 410, 418, 143 A.2d 469 (1958)). "Equivocation and uncertainty, whether in the significance of the terms used or in the form and construction of sentences, are to be resolved in favor of the insured and against the insurer." *Allen v. Berkshire Mut. Fire Ins. Co.,* 105 Vt. 471, 475, 168 A. 698 (1933) (cited in *Northern Security Insurance,* 683 A.2d at 395).

When read in the context of the entire policy, both the "use of aircraft" clause and the "pilot experience" clause of the policy must be construed as exclusions rather than conditions precedent. In reaching this conclusion, the Court considers a number of provisions in the policy. First, the use of aircraft clause, which appears in Item 10 of the Coverage Identification Page, states:

THE USE OF THE AIRCRAFT: The aircraft will be used for your personal and business related purposes where no charge is made for such use and also will be used for the following purposes:

SEE ENDORSEMENT NUMBER 1

Endorsement Number 1 provides in relevant part:

2. YOUR AERIAL PHOTOGRAPHY FOR WHICH YOU MAKE A CHARGE. (SEE ENDORSEMENT NUMBER 2.)

Endorsement Number 2 provides in relevant part:

1. THIS ENDORSEMENT CHANGES ITEM 10 OF THE COVERAGE IDENTIFICATION PAGE—THE USE OF THE AIRCRAFT—TO INCLUDE THE FOLLOWING USE AS INDICATED BY AN "X":

X YOUR AERIAL PHOTOGRAPHY FOR WHICH YOU MAKE A CHARGE

2. IN ADDITION TO OTHER PARTS OF YOUR POLICY, THE FOLLOWING ADDITIONS AND/OR DELETIONS APPLY WHEN THE AIRCRAFT IS OPERATED FOR THE ABOVE DESCRIBED USE:

\* \* \* \* \* \*

B. AS INDICATED BY AN "X"

1. X THERE IS NO COVERAGE FOR THE AERIAL PHOTOGRAPHY EQUIPMENT WHETHER OR NOT ATTACHED TO THE AIRCRAFT.

2. X BODILY INJURY TO PASSENGER IS DELETED UNDER PART THREE—LIABILITY TO OTHERS

The pilot experience clause, which appears in Item 9 of the Coverage Identification Page of the policy, states in pertinent part:

THE PILOT FLYING THE AIRCRAFT: The aircraft must be operated in flight only by a person shown below who must have a current and proper (1) medical certificate and (2) pilot certificate with necessary ratings as required by the FAA for each flight. There is no coverage under the policy if the pilot does not meet these requirements....

American Eagle's argument that the use of aircraft and pilot experience clauses are conditions precedent rests principally on the use of certain conditional language in the policy. American Eagle points to the second sentence in Item 9 of the Coverage Identification Page, which provides, "There is no coverage under the policy if the pilot does not meet these [medical and pilot certificate] requirements." American Eagle notes the use of "if" in this sentence, and contends that

---

1. The rationale for construing ambiguities in favor of the insured is that the insurer writes the policy, and is therefore in a better position to avoid ambiguity. *Peerless Ins. Co. v. Wells,* 154 Vt. 491, 494, 580 A.2d 485 (1990).

such conditional language is a clear, unambiguous indication that policy coverage does not attach unless and until the pilot and medical certificate requirements are met.

In addition, American Eagle relies on similar, seemingly conditional language in Part One of the policy, entitled "GENERAL PROVISIONS AND CONDITIONS." [2] In particular, it notes the following language: "We agree to provide the coverage in your policy if you pay the premium and comply fully with the policy requirements, but if you do not, we are not obligated to you or anyone. . . ." The paragraph immediately following this clause requires the insured to make certain that the requirements of Item 9 are met. It states further, "There is no coverage under the policy if the pilot does not meet these requirements." The next paragraph requires the insured to make certain that the requirements of Item 10 are met.

Finally, American Eagle relies on case law from other jurisdictions in which pilot rating clauses were held to be conditions precedent.[3] While these cases do not concern Vermont law, American Eagle contends that their reasoning and their conclusions of law should be adopted by the Court. American Eagle cites no cases regarding use of aircraft clauses.

Smith disputes American Eagle's contention that the policy terms in question are unambiguously conditions precedent. In

support of his argument, he points to Paragraph four of Part Three (Liability to Others) of the policy. It provides in pertinent part:

4. What is not Covered

We do not cover any:

a. *Pilots and Use*

Bodily injury or property damage unless the requirements of the Coverage of the Identification Page regarding Pilots (Item 9) and Use (Item 10) are met[.]

Smith contends that the heading "What is not Covered" is synonymous with "Exclusions from Coverage." Because the pilot experience clause (Item 9) and the use of aircraft clause (Item 10) are explicitly incorporated into this provision, Smith argues, they were intended by American Eagle to be exclusions.

Smith cites several cases from other jurisdictions in which pilot rating clauses have been considered exclusions from coverage.[4] Of particular note is *United States Fire Ins. Co. v. West Monroe Charter Service*, 504 So.2d 93, 96, 101 (La.App.Ct.1987), *writ denied*, 505 So.2d 1141 (La.1987), in which the exact same pilot experience clause as that in Item 9, and a use of aircraft clause similar to that in Item 10, were held to be exclusions from coverage. In addition, Smith cites several cases in which a "flight for charge"

---

2. Part One of the policy, entitled "GENERAL PROVISIONS AND CONDITIONS," states in pertinent part:

    2. Our Obligations and Your Duties
      We agree to provide coverage in your policy *if* you pay the premium and comply fully with the policy requirements, but *if* you do not, then we are not obligated to you or anyone. . . . [emphasis added]
    3. The Pilot Flying the Aircraft
      You must make certain that the pilot operating the aircraft in flight meets the requirements shown in Item 9 of the Coverage Identification Page. There is no coverage under the policy *if* the pilot does not meet these requirements. [emphasis added]
American Eagle also relies on a provision of Part Three of the policy, entitled "LIABILITY TO OTHERS," which provides:
    4. What is Not Covered
      We do not cover any:
      a. *Pilots and Use*
    Bodily injury or property damage *unless* the requirements of the Coverage Identification

Page regarding Pilots (Item 9) and Use (Item 10) are met. . . . [emphasis added]
American Eagle contends that this clause demonstrates that the use of aircraft clause (Item 10) is a condition precedent as well.

3. Among the cases cited by American Eagle are: *Edmonds v. United States*, 642 F.2d 877, 883 (1st Cir.1981); *United States Aviation Underwriters, Inc. v. Cash Air, Inc.*, 409 Mass. 694, 568 N.E.2d 1150 (1991); *Levra v. National Union Fire Ins. Co. of Pittsburg*, 99 Idaho 871, 590 P.2d 1017 (1979).

4. Smith relies on: *United States Fire Ins. Co. v. West Monroe Charter Service, Inc.*, 504 So.2d 93, 96 (La.App.Ct.1987), *writ denied*, 505 So.2d 1141 (La.1987); *Woods v. Insurance Co. of North America*, 38 Cal.App.3d 144, 113 Cal.Rptr. 82 (Cal.App.1974); *United States Aviation Underwriters, Inc. v. Rex Ray Corp.*, 14 Avi 17, 625, 17, 627 (Mass.Superior Ct.1979).

clause has been held to be an exclusion,[5] and notes that unlike the pilot rating cases, there appear to be no cases in which a flight for charge clause has been held to be a condition precedent.

Smith has effectively raised the specter of ambiguity regarding the meaning of Items 9 and 10 of the Coverage Identification Page. The conditional language used in Items 9 and 10, as well as in the other portions of the policy cited by American Eagle, mitigate in favor of a finding that the clauses are conditions precedent. However, as Smith argues, Paragraph 4 of Part Three of the policy strongly suggests that the disputed clauses are in fact exclusions. The clauses are reasonably and fairly susceptible of the two different interpretations advanced by American Eagle and Smith.

Because ambiguity exists as to the meaning of Items 9 and 10, it is, under Vermont law, undisputably clear that the Court must decide the ambiguity in favor of Smith. Thus, the Court holds that the pilot experience clause and the use of aircraft clause are both exclusions from coverage rather than conditions precedent. As such, American Eagle bears the burden of proof as to the applicability of each of these provisions to the facts of this case.

### 2. American Eagle's Motion for Summary Judgment

■ American Eagle's first argument for summary judgment is that Leggett made a charge for the October 12, 1995 flight, and therefore no coverage exists under the policy, as provided in the use of aircraft clause.[6] American Eagle contends that there is no genuine dispute of the fact that Leggett charged Mrs. Smith $90.00 for the flight. It relies on the handwritten note of Mrs. Smith, found at the scene of the crash, on which is written, in part, "$90.00 from Rutland to Norwich for pilot & plane." Moreover, American Eagle contends that, based on conversations with Mrs. Smith, James Wooster understood that there would be a $90.00 charge for the flight. American Eagle also notes that Leggett's aerial photography business, Skyview Photography, was a for-profit enterprise, and that there is no reason to believe that Leggett intended to provide his services for free, given that Leggett had never met the Smiths before.

American Eagle recognizes that the term "charge" has been construed by other courts to allow the sharing of expenses among aircraft passengers.[7] While American Eagle and Smith disagree over what constitutes permissible shared expenses, American Eagle concedes that they at least include shared fuel and oil costs. However, American Eagle contends that there is no factual dispute as to the fact that the $90.00 charge is greater than the permissible shared expenses. It bases this conclusion on an analysis of the hourly cost of fuel and oil for the aircraft as

---

5. Smith cites the following: *American Cas. Co. of Redding, Pa. v. Eagle Star Ins. Co.*, 568 P.2d 731, 732 (Utah 1977); *Fidelity & Cas. Co. of New York v. Marion L. Crist & Assocs. Inc.*, 248 Ark. 1010, 455 S.W.2d 904, 905 (1970); *West Monroe Charter Service*, 504 So.2d at 101.

6. As discussed above, the use of aircraft clause excludes coverage when there is a charge made for use of the aircraft. Endorsement 1 adds coverage for "Your aerial photography for which you make a charge," but as provided in Endorsement 2, bodily injury to passengers is not covered when the plane is used for such aerial photography. "Your" and "you" are defined in the policy as "the person or organization named in Item 1 of the Coverage Identification Page under the heading 'Name Insured.'" The organization listed in Item 1 is Rutland Flyers. American Eagle and Smith debate whether the aerial photography endorsement applies in this case, and disagree as to whether it is intended to

cover all aerial photography, or merely that aerial photography done by Rutland Flyers and for which Rutland Flyers makes a charge. In the present motion for summary judgment, this dispute is irrelevant because in either case the critical issue is whether there was in fact a charge.

7. The parties cite the following cases as interpreting "no charge" clauses to allow some sharing of expenses: *Houston Fire & Cas. Ins. Co. v. Ivens*, 338 F.2d 452, 455 (5th Cir.1964); *Fidelity And Cas. Co. of N.Y. v. Marion L. Crist & Assoc.*, 248 Ark. 1010, 455 S.W.2d 904, 910 (1970); *Monarch Ins. Co. v. Siegel*, 625 F.Supp. 693 (N.D.Ind.1986); *Flagstaff Mortuary, Inc. v. Gamble*, 135 Ariz. 474, 662 P.2d 149, 150 (App.1983); *Cammack v. Avemco Ins. Co.*, 264 Or. 287, 505 P.2d 348 (1973); *Thompson v. Ezzell*, 61 Wash.2d 685, 379 P.2d 983 (1963); *Kohler v. Proprietors Ins. Co.*, 394 So.2d 463, 464 (Fla.App. 1981).

well as the duration of the October 12, 1995 flight had it been completed.

Ultimately, American Eagle has failed to meet its burden in demonstrating the absence of material factual disputes. Contrary to its claim, there is a genuine dispute regarding whether Leggett charged the Smiths $90.00, and if so, what that charge was for. Mrs. Smith's note does say "$90 from Rutland to Norwich for pilot and plane", but immediately below those words is written "gyrostabilizer," thus suggesting the possibility, advanced by Smith, that the $90.00 was at least in part for rental of Leggett's photographic equipment. Statements made by James Wooster are also less clear than American Eagle suggests them to be. Wooster stated in his deposition, "we didn't discuss exactly what [the $90.00 figure] was going to pay for. I just—that that is what it would cost to have the picture taken, pictures taken." Wooster Deposition at 16–17 (Paper No. 81, Exhibit 5). The $90.00 figure, Smith suggests, was a mere estimate.

Even if American Eagle were able to prove that Leggett had charged the Smiths $90.00, a genuine factual dispute would still exist as to whether the $90.00 constituted permissible expense-sharing. American Eagle has argued that the fuel and oil expenses for the aircraft were $21.00 per hour (a fact conceded by Smith), and that the likely duration of the flight was 1.2 to 1.3 hours. The $90.00 figure, therefore, is in excess of the total fuel and oil costs for the flight, much less a portion of those costs. Smith contends that overall operating expense, and not merely the cost of fuel and oil, should be included in an expense-sharing calculation. Smith argues further that Mrs. Smith had discussed the possibility of flying over Woodstock in addition to the fly-over of the Wooster property, in which case the duration of the flight would have been approximately 3.5 to 4.5 hours. American Eagle counters that despite the dispute over the duration of the flight, summary judgment may still be entered in its favor because even if Smith's time estimate is accepted, the Court must

conclude that Leggett made a charge which exceeded permissible sharing of costs.[8] However, American Eagle's argument ignores the possibility that only a portion of the charge may have been for Leggett's services, while the rest was for rental of the photographic equipment. Thus, regardless of whether only fuel and oil costs or total operating costs are permissible for expense-sharing purposes, a genuine dispute exists. Drawing all inferences in favor of Smith, the nonmoving party, it is reasonable to conclude that any charge levied against the Smiths did not exceed the level of permissible expense-sharing.

In light of the foregoing discussion, it is evident that genuine issues of factual dispute exist as to whether there was a charge for the October 12, 1995 flight; whether some or all of any such charge was for rental of photographic equipment; the planned itinerary for the flight; and the duration of the flight, had it been completed.

■ American Eagle's argument for summary judgment on the basis of the pilot experience clause of the policy is similarly unavailing. As discussed above, the pilot experience clause requires an insured pilot to hold the necessary medical and pilot certificates required by FAA regulations. Of particular importance in this case is a Federal Aviation Rule ("FAR"), found at 14 C.F.R. § 61.118, which provides in pertinent part:

Except as provided in paragraphs (a) through (d) of this section, a private pilot may not act as a pilot in command of an aircraft that is carrying passengers or property for compensation or hire nor may he, for compensation or hire, act as a pilot in command of an aircraft.

\* \* \* \* \* \*

(b) A private pilot may share the operating expenses of a flight with his passengers.

American Eagle contends that Leggett, who held only a private pilot's license, accepted "compensation for hire," and therefore was not properly licensed for the October 12,

---

**8.** If the flight had lasted 4.5 hours, then the total cost for fuel and oil, at $21.00 per hour, would be $94.50, exceeding the $90.00 that American Eagle alleges was charged by Leggett. However, American Eagle argues that because only expense-*sharing* is permissible, only a portion of the $94.50 could be assessed against the Smiths. That portion, it contends, would be substantially less than $90.00.

1995 flight. In order to properly accept compensation for hire, a pilot must have a commercial pilot's license. Furthermore, American Eagle argues, because Leggett was carrying passengers for hire, he was required to have at least a Class II medical certificate, but in fact held only a Class III medical certificate.[9] Thus, according to American Eagle, by accepting compensation for hire, Leggett failed to comply with the pilot experience clause of the policy, thereby releasing American Eagle from the obligation of coverage.

The fact that the FARs permit expense-sharing, as provided in 14 C.F.R. § 61.118(c), renders the Court's analysis of the pilot experience clause of the policy essentially identical to that of the use of aircraft clause discussed above. Indeed, as both parties concede, at the very least fuel and oil costs may be shared by a pilot and his or her passengers. Therefore, the same factual issues in material dispute found with regard to the use of aircraft clause are also in dispute with regard to the pilot experience clause. Because such factual disputes exist, summary judgment is inappropriate, and American Eagle's motion is DENIED.

### 3. Smith's Motion for Summary Judgment

Smith's motion for summary judgment relies upon the Court's finding that the disputed policy clauses are exclusions rather than conditions precedent. Because they are exclusions, American Eagle bears the burden of proving their applicability. Smith contends that American Eagle cannot show, as is its burden to do, that Leggett made a "charge," or that the arrangement entered into by Leggett and Mrs. Smith was anything other than permissible expense-sharing. He argues that Leggett and Mrs. Smith were the only people who knew the terms of their agreement, and since both died in the plane crash, American Eagle is unable to show that a charge was made.

The Court finds that a rational jury could conclude, based on the evidence now before the Court, that a charge had been made, despite the fact that Leggett and Mrs. Smith both died in the crash. As discussed above,

the note in Mrs. Smith's handwriting, the deposition testimony of James Wooster, as well as American Eagle's approximations of how long the flight would have taken, all demonstrate genuine factual disputes with regard to the existence of a charge. Viewing the evidence in the light most favorable to the nonmovant, it is evident that genuine issues of factual dispute exist, and that Smith's motion must be DENIED.

### III. Conclusion

Based on the foregoing analysis, Defendant/Plaintiff–in–Cross–Claim Smith's Motion for Partial Summary Judgment (Paper No. 49) is hereby GRANTED, while Smith's Motion for Summary Judgment (Paper No. 71) and Plaintiff American Eagle's Motion for Summary Judgment (Paper No. 81) are hereby DENIED.

---

**9.** 14 C.F.R. § 61.123 states in relevant part: "To be eligible for a commercial pilot certificate a person must ... (c) Hold at least a valid second-class medical certificate...."